UNITED STATES of America, Appellee,

v.

Mary Ann IRON SHIELD, Appellant.

No. 82–1718.

United States Court of Appeals, Eighth Circuit.

Submitted Nov. 12, 1982.

Decided Jan. 21, 1983.

---

**3.** The amount of the 1975 and 1976 underpayments was withheld by the government from contract payments due Williams.

Vance K. Hill, Bismarck, N.D., for appellant.

Rodney S. Webb, U.S. Atty., Jerome C. Kettleson and Charles S. Miller, Jr., Asst. U.S. Attys., Bismarck, N.D., for appellee.

Before LAY, Chief Judge, HENLEY, Senior Circuit Judge, and ARNOLD, Circuit Judge.

ARNOLD, Circuit Judge.

Mary Ann Iron Shield appeals her conviction in the District Court[1] of the involuntary manslaughter of her husband, Sherman Iron Shield. The indictment charged murder in the second degree in violation of 18 U.S.C. §§ 1153 and 1111. She argues that the trial court erred in instructing on the lesser included offense of involuntary manslaughter under 18 U.S.C. § 1112(a) and contests the sufficiency of the evidence to support the verdict. We affirm.

## I.

Sherman Iron Shield died in the early morning hours of November 12, 1981, a few steps from the door of his home on the Standing Rock Indian Reservation in North Dakota. His death resulted from a knife wound to the left side of his chest which pierced his heart and a small portion of his liver. His death was the culmination of an altercation with his wife, the defendant, which followed a long evening of drinking with friends and relatives. Earlier in the evening, Mary Ann Iron Shield and her sister joined her husband, half-sister, and half-brother at a local bar. After the bar closed, the group bought a case of beer and returned to the Iron Shield residence, where they sat around the dining table and continued drinking and visiting. After some time Sherman became argumentative, as he often did, and began accusing Mary Ann of infidelity. This was evidently a prelude which had been repeated many times in the course of their troubled seventeen-year marriage. Mary Ann responded by denying the accusations and adverting to Sherman's inability to hold a job and his lack of support for her and their five children. Finally she told him to get out of the house. As he rose from the table, he knocked over the chair in which he had been sitting.

Sherman then went out to the front yard, leaving the storm door closed and the front door open. He continued his belligerence by taunting Mary Ann and her brother to come out and fight. The precise sequence and timing of events from this point is less than clear, since all participants' and witnesses' recollections are clouded by their drinking. At some point Sherman called to Mary Ann, saying that if she would bring him another beer, he would leave her alone. She complied with his request and handed him a beer through the opened storm door. As she did so Sherman grabbed her arm and threw beer in her face from a can he already had. He then proceeded to slam the door on her arm a number of times. When Mary Ann managed to free her arm from the door, she ran to the kitchen, some twenty-five feet from the door, and pulled a large carving knife from a drawer. She testified that she then went to the door intending only to brandish the knife so as to frighten Sherman away from the house. Precisely what happened after Mary Ann stepped onto the front porch is unclear. She testified that she does not remember stabbing Sherman, but only pulling the knife from his chest. He died on the sidewalk near the front steps to the house.

Mary Ann immediately went to seek medical help for Sherman from the community health representative, Collette Carry Moccasin, who lived nearby.[2]

The defendant was charged by indictment[3] with murder in the second degree.

---

1. The Hon. Bruce M. Van Sickle, United States District Judge for the District of North Dakota.

2. Mary Ann was herself subsequently treated at a nearby hospital for the injuries to her arm, and the arm was placed in a sling or bandage.

She testified that both her arm and shoulder were badly bruised and that she lost a fingernail as a result of the injury.

3. Because both the decedent and the defendant are Indians, and because the killing occurred

Her trial lasted two and one-half days. On the first day of its deliberations the jury acquitted her of second-degree murder. On the second day it acquitted on the lesser included charge of voluntary manslaughter, and on the third day the jury convicted Mary Ann Iron Shield of involuntary manslaughter. The District Court sentenced the defendant to three years with imposition of sentence suspended, and placed her on probation for five years.

## II.

At trial Mary Ann raised the defense of self-defense from the perspective of a battered wife. There is no question that Mary Ann Iron Shield was beaten repeatedly, if not regularly, by her husband almost from the inception of their marriage. She testified, with corroboration by others, that Sherman frequently beat her, both at home and in public, since as far back as 1967. She described an episode in a bar in 1978 when Sherman knocked her to the ground and kicked her repeatedly in the groin. She was taken to the hospital, with her boots full of blood, where she stayed for four days. On other occasions she received black eyes and lost teeth. She lived in such fear of Sherman that she dropped divorce proceedings against him in 1976 because of threats he made to her and their children. His power over her was such that he could even require her to accompany him while he conducted liaisons with other women; Mary Ann would wait in the car while Sherman took care of his business.

Mary Ann's testimony regarding their marriage, as corroborated by others, is such as to arouse more sympathy for the defendant than the decedent. Her counsel argued that she knew she was on the verge of another major beating and that she pursued a reasonable and necessary course of self-defense. Self-defense, it is argued, involves intentional conduct and is inherently inconsistent with involuntary manslaughter. This species of homicide is distinguished

within the boundaries of the Standing Rock Indian Reservation, the matter was within fed-

from voluntary manslaughter and defined by 18 U.S.C. § 1112(a):

(a) Manslaughter is the unlawful killing of a human being without malice. It is of two kinds:

Voluntary—Upon a sudden quarrel or heat of passion.

Involuntary—In the commission of an unlawful act not amounting to a felony, or in the commission in an unlawful manner, or without due caution and circumspection, of a lawful act which might produce death.

There is authority supporting the appellant's argument that self-defense and involuntary manslaughter are inconsistent and that it is error to instruct on the lesser included offense of involuntary manslaughter in the face of a plea of self-defense. See *Brooks v. Commonwealth,* 486 S.W.2d 695, 696 (Ky.1972); *United States v. Smith,* 521 F.2d 374 (10th Cir.1975). Such an instruction arguably abrogates the complete nature of self-defense as a defense. The problem with Mary Ann's position is, however, that her assertion of self-defense was equivocal at best.

The defendant's trial strategy was this: We don't know exactly how Sherman's death occurred, and we can never know just what happened because Mary Ann doesn't remember. She did not intend to kill him, even though she had every right to do so, her counsel argued. In his opening statement, he asserted: "We hope to prove that even though the death was an *accident,* Mary Ann Iron Shield was entitled under the laws of the United States to protect herself." Tr. 38 (emphasis supplied). Moreover, in cross-examination of the government's pathologist it was repeatedly suggested that Sherman could have run against the knife. Tr. 108, 112. Finally, in his closing argument defense counsel twice emphasized that Sherman could have charged into the knife. Tr. 267, 271. This approach, we think, put in issue whether Mary Ann might have been guilty of gross

eral jurisdiction. 18 U.S.C. § 1153.

negligence in so brandishing the knife, and whether this negligence could be sufficient to convict her under that portion of § 1112(a) which refers to a killing "in the commission ... without due caution and circumspection, of a lawful act which might produce death."

Had the circumstances been only a little different, that is, had Mary Ann said, "Yes, I remember Sherman charging at me and I had to stab him to protect myself," then we might agree that an instruction on involuntary manslaughter would be inappropriate. Such were essentially the facts in *Brooks v. Commonwealth, supra.* The facts of this case, however, are such that the jury could reasonably have inferred that Mary Ann was guilty of that gross degree of negligence necessary for involuntary manslaughter, see *United States v. Schmidt,* 626 F.2d 616, 617 (8th Cir.1980), given that she was evidently intoxicated[4] and chose to approach the decedent, who was also intoxicated, with a dangerous weapon. Her admission that she intended to frighten Sherman with the knife and stepped outside the door with that intention, Tr. 153, 154, further supports an inference of negligence on her part. Had Sherman's death occurred in the house, a different case might be presented. We think it significant, however, that Mary Ann left the house and the company of others, in a sense in pursuit of Sherman. The jury could reasonably find that this affirmative conduct on her part is inconsistent with the need to protect one's self from immediate peril and that it was also criminally blameworthy. Possibly that would not have been our verdict had we been on the jury, but we are not at liberty to reverse simply on that ground.

The District Court was therefore correct in instructing on the lesser included offense of involuntary manslaughter, even though the instruction was not requested by the government and was objected to by the defendant. Moreover, there is substantial evidence to support the jury's verdict.

This disposition of the appellant's contentions makes unnecessary any consideration of the question whether Mary Ann's conduct in brandishing the knife amounted to a felony for purposes of § 1112(a).

The judgment is affirmed.

---

4. Mary Ann testified that she drank "about seven" beers at the bar earlier in the evening and that she continued drinking at home. Tr. 148, 150.

