F I L E D
United States Court of Appeals
Tenth Circuit

JUN 24 1998

PATRICK FISHER
Clerk

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

UNITED STATES OF AMERICA,

      Plaintiff - Appellee,

v.

ARVIN BENALLY,

      Defendant - Appellant.

No. 96-2291

---

**Appeal from the United States District Court
for the District of New Mexico
(D.C. No. CR-95-584-SC)**

---

John Van Butcher, Assistant Federal Public Defender, Albuquerque, New Mexico,
for the Defendant - Appellant.

Mary Catherine McCulloch, Assistant United States Attorney (John J. Kelly,
United States Attorney, with her on the brief), Albuquerque, New Mexico, for the
Plaintiff - Appellee.

---

Before **BRISCOE**, **McWILLIAMS** and **LUCERO**, Circuit Judges.

---

**LUCERO**, Circuit Judge.

---

    Arvin Benally appeals his conviction of voluntary manslaughter, arguing

that the district court erroneously failed to instruct the jury on self-defense and

involuntary manslaughter, and wrongly denied two motions to suppress evidence. We agree that the record reveals evidence upon which a reasonable jury could have acquitted defendant on the basis of self-defense, or, alternatively, found him guilty of involuntary manslaughter. Consequently, we reverse and remand for a new trial.[1]

## I

On the night of October 3, 1995, Jonathan Benally, Arvin Benally, Rodrick Benally, Cheryl Largo and Christina Talk gathered near Arvin's home to talk, drink, and listen to music. After Jonathan and Arvin left to purchase a half pint of whiskey, Russell John joined the group. Following Jonathan and Arvin's return, Russell offered them $20 to purchase additional beer. Told the liquor stores were closed, Russell offered to obtain marijuana instead and left. According to Rodrick Benally, Jonathan then proposed that "if he doesn't come back with the marijuana . . . we should take that $20 from him," R., Vol. X, at 120, and Arvin agreed.

Accounts differ as to what transpired when Russell returned without the marijuana. Rodrick testified that Jonathan and Arvin were upset, and that Jonathan refused to accept Russell's excuses and threw him to the ground "for no

---

[1]In an unpublished opinion issued today, United States v. Jonathan Benally, No. 96-2296, (10th Cir. June 24, 1998), we affirm the conviction for second degree murder of Arvin's codefendant.

reason." Id. at 123. According to Rodrick, Russell then knocked Jonathan to the ground and suddenly punched Arvin in the face, knocking his glasses off and drawing blood. Arvin testified that he was struck as he attempted to break up the fight between Jonathan and Russell. He also stated that Russell's blow caused him to black out momentarily.

The testimonies of Rodrick and Arvin also conflict in their account of the subsequent melee. We summarize Rodrick's testimony first. According to Rodrick, Jonathan tackled Russell, sat on him, and punched him repeatedly in the face. Arvin kicked Russell in the head and side and was restrained by Rodrick. Jonathan then renewed his attack, "kicking [Russell] side to side and . . . in the groin area." Id. at 131. Pulling down Russell's pants, Jonathan again kicked him in the groin. Arvin then hit Russell in the face, and was restrained once more. During cross-examination, Rodrick testified that Arvin had struck Russell no more than four times during the fight. As Arvin and Rodrick were looking for Arvin's glasses, Jonathan cut and stabbed Russell's buttocks and kicked him again. The group then abandoned Russell and agreed to lie about their whereabouts that night.[2] Later that night when Arvin and Rodrick returned to

_____

[2]Cheryl Largo testified that shortly after they left the scene, Jonathan bragged about having blood on his hands. By Christina Talk's account, Jonathan also bragged about how much he had hurt Russell and that he had killed him.

- 3 -

search for the missing glasses, Arvin stated he wanted to strike Russell because "[t]hat son of a bitch hit me," id. at 146, but he was stopped by Rodrick.

By Arvin's account, his role in the fight was minimal. After being struck by Russell as he attempted to break up the fight, he could not see because his glasses had been knocked from his face and it was dark. He then "pushed and shoved" Jonathan and Russell to keep them away from him, R., Vol. XI, at 312, and began looking for his glasses before retreating to a pickup truck. He could not see what transpired in the fight between Jonathan and Russell. Though he admitted striking Russell in response to Russell's punch, Arvin stated that he only did so because he "didn't want to get hit again." Id. at 324. He denied intent to hurt or kill anyone.

Russell's body was discovered the next morning. Arvin was charged with first degree murder in violation of 18 U.S.C. §§ 1153[3] and 1111(a). He was also charged with aiding and abetting first degree murder in violation of 18 U.S.C. § 2. The district court instructed the jury as to first degree murder and the lesser included offenses of second degree murder and voluntary manslaughter. Over

_____

[3]Section 1153 provides for the application of select criminal laws (including murder and manslaughter) to crimes by Native Americans in Indian country. See § 1153(a). At trial, it was stipulated that both Arvin Benally and Russell John were enrolled members of the Navajo tribe and that the alleged offense occurred within the boundaries of the Navajo Indian Reservation in the state of New Mexico. See R., Vol. XI, at 278.

- 4 -

defense objection, the court refused to instruct on either self-defense or involuntary manslaughter. The jury returned a verdict of guilty as to voluntary manslaughter.

## II

Defendant appeals the district court's decision denying his requested instruction on self-defense. It is well established that "a defendant is entitled to an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor." Mathews v. United States, 485 U.S. 58, 63 (1988). Had the jury credited Arvin's account of the fight, they could properly have concluded that Arvin acted in self-defense. By his account, Russell struck him first, causing him to black out momentarily. He further testified that from that point on, his actions were solely intended to prevent being hit again. If Arvin's testimony were credited, the jury could reasonably have believed that the force Arvin used in self-defense was reasonable in light of the

threat presented.[4]  Consequently, the district court erred in denying the requested

instruction.

_____

[4]The dissent contends that, viewing the evidence "in a light most favorable to the government" and applying principles of aider and abettor liability, the district court's denial of defendant's proposed jury instructions was proper.  In so doing, the dissent misapprehends the appropriate standard of review.  *One* reasonable inference from this record may be that Arvin and Jonathan, acting jointly, beat Russell "to a pulp."  But, on the basis of the record, we cannot say that it would have been unreasonable for the jury to have concluded that Arvin's actions were independent of those of Jonathan.  Moreover, a defendant charged as an aider and abettor is still entitled to jury instructions which reflect the evidence presented at trial.  See Mathews, 485 U.S. at 63.

In reviewing the denial of a jury instruction, "we must give full credence to defendant's testimony."  United States v. Smith, 63 F.3d 956, 965 (10th Cir. 1995) (citing United States v. Williams, 791 F.2d 1383, 1388 (9th Cir. 1986)), vacated on other grounds, 516 U.S. 1105 (1996); see also United States v. Scafe, 822 F.2d 928, 932 (10th Cir. 1987) ("A defendant is entitled to jury instructions on any theory of defense finding support in the law and the evidence.").  For present purposes, therefore, we must credit Arvin's contentions that he merely "pushed and shoved" after being struck by Russell and that his actions were motivated by a desire to avoid being hit again.  Thus, even though Arvin could have caused Russell's death, the facts and the law permit Arvin's actions to be characterized as self-defense.  See United States v. Begay, 833 F.2d 900, 901 (10th Cir. 1987) (self-defense instruction warranted when defendant "attempts to use nondeadly force," but does so in manner resulting in death) (quoting United States v. Manuel, 706 F.2d 908, 915 (9th Cir. 1983)); see also People v. Sam, 454 P.2d 700, 710-11 (Cal. 1969) (holding that where use of "reasonable, nondeadly force" causes death, defendant entitled to instruction on self-defense);  Garramone v. State, 636 So. 2d 869, 871 (Fla. Dist. Ct. App. 1994) (reversing for failure to instruct on justifiable use of nondeadly force, noting "it is the nature of the force and not the end result that must be evaluated"); White v. Commonwealth, 333 S.W.2d 521, 524 (Ky. 1960) ("[W]here no deadly weapons are involved and the defendant is entitled to an instruction on involuntary manslaughter, an unintentional homicide, he is entitled to a further instruction on the theory of defense against ordinary assault and battery, against the menace of mere bodily harm as distinguished from the threat of death or great bodily harm."); State v. Hare, 575 N.W.2d 828, 833 (Minn. 1998) (holding it error to give self-defense instruction requiring that defendant believe his actions were necessary to avert death or great bodily harm when defendant claimed that the victim's death was accidental).  We cannot therefore agree with the dissent that, *as a matter of law*, Arvin used excessive force.  That determination is for a properly instructed jury to make.

## III

We next consider defendant's challenge of the district court's failure to charge the jury on the lesser included offense of involuntary manslaughter. Although "[t]he decision of whether there is enough evidence to justify a lesser included offense charge rests within the sound discretion of the trial judge," United States v. Chapman, 615 F.2d 1294, 1298 (10th Cir. 1980) (citing United States v. Busic, 592 F.2d 13 (2d Cir. 1978)), a defendant is entitled to such an instruction if:

> (1) there was a proper request; (2) the lesser included offense includes some but not all of the elements of the offense charged; (3) the elements differentiating the two offenses are in dispute; and (4) a jury could rationally convict the defendant of the lesser offense and acquit him of the greater offense.

United States v. Moore, 108 F.3d 270, 272 (10th Cir. 1997). If these four factors are satisfied, the trial court is required to provide the requested instruction. See United States v. Duran, 127 F.3d 911, 914-15 (10th Cir. 1997). Only if we are convinced that the evidence presented at trial is such that a rational jury could acquit on the charged crime but convict on the lesser included offense may the denial of the requested instruction be reversed. See Moore, 108 F.3d at 272 (citing Keeble v. United States, 412 U.S. 205 (1973)); see also Keeble, 412 U.S. at 208 ("[I]t is now beyond dispute that the defendant is entitled to an instruction on a lesser included offense if the evidence would permit a jury rationally to find him guilty of the lesser offense and acquit him of the greater.") (emphasis added).

It is undisputed that defendant properly requested a jury instruction on involuntary manslaughter, see R., Vol. XII, at 401-02, and involuntary manslaughter is a lesser included offense of the offense charged, see United States v. Skinner, 667 F.2d 1306, 1309 & n.1 (9th Cir. 1982). The issue for us to decide is whether a rational jury could not have convicted defendant of involuntary manslaughter while acquitting him of voluntary manslaughter.

Involuntary manslaughter is defined as the "unlawful killing of a human being without malice . . . [i]n the commission of an unlawful act not amounting to a felony, or in the commission in an unlawful manner, or without due caution and circumspection, of a lawful act which might produce death." 18 U.S.C. § 1112(a). Defendant claims that because Russell was the initial aggressor, he was entitled to an involuntary manslaughter instruction based on imperfect self-defense—i.e., that Russell died as a consequence of a lawful act committed in an unlawful manner. Alternatively, he insists his actions on the night of Russell John's death could be characterized as misdemeanor assault resulting in death, thus constituting involuntary manslaughter. We consider these arguments.

## A

Defendant's first contention is that a reasonable jury could have found that he negligently caused Russell's death while acting in self-defense. He argues that an involuntary manslaughter instruction was warranted because he attempted to

use nondeadly force, but did so in a criminally negligent manner and death resulted. See United States v. Begay, 833 F.2d 900, 901 (10th Cir. 1987).

As discussed in the preceding section, a rational jury could have believed Arvin's actions were in self-defense. This court has recognized that involuntary manslaughter "can occur in circumstances that would support a defense of self defense." Begay, 833 F.2d at 901 (quoting United States v. Manuel, 706 F.2d 908, 915 (9th Cir. 1983)); see also United States v. Browner, 889 F.2d 549, 555 (5th Cir. 1989) (holding that both involuntary manslaughter and self-defense instructions are proper when there is evidence that the killing was accidental); United States v. Iron Shield, 697 F.2d 845, 848 (8th Cir. 1983) (upholding district court's decision to instruct on both involuntary manslaughter and self-defense). "If the defendant attempts to use nondeadly force, [but does so in a manner that results in death], then both involuntary manslaughter and self-defense instructions would be warranted." Begay, 833 F.2d at 901 (quoting Manuel, 706 F.2d at 915). The jury could have concluded from the evidence presented at trial that Arvin's actions constituted the criminally negligent exercise of nondeadly force. Consequently, it was error for the district court to refuse to instruct the jury on this theory of involuntary manslaughter.

**B**

Alternatively, defendant argues the jury could have found that, although his actions resulted in the death of Russell John, they did not constitute a felony. We reject this claim. Assault resulting in serious bodily injury is a felony, see 18 U.S.C. § 113(a)(6);[5] it is also a general intent crime. It is not necessary that defendant have assaulted the victim with the intent to do serious bodily harm—the resulting serious bodily injury coupled with the general intent to assault is sufficient to satisfy the elements of the felony. See United States v. Fitzgerald, 882 F.2d 397, 399 (9th Cir. 1989) (holding that specific intent is not element of assault resulting in serious bodily injury); United States v. Lewis, 780 F.2d 1140, 1142-43 (4th Cir. 1986) ("Section [113(a)(6)] says nothing about intent. In the absence of an explicit statement that a crime requires specific intent, courts often

_____

[5]Section 113(a)(6) states:

Whoever, within the special maritime and territorial jurisdiction of the United States, is guilty of an assault shall be punished as follows:

* * *

(6) Assault resulting in serious bodily injury, by a fine under this title or imprisonment for not more than ten years, or both.

"Serious bodily injury" is defined as "bodily injury which involves—(A) a substantial risk of death; (B) extreme physical pain; (C) protracted and obvious disfigurement; or (D) protracted loss or impairment of the function of a bodily member, organ, or mental faculty." See § 113(b)(2) (adopting the definition of "serious bodily injury" codified at 18 U.S.C. § 1365(g)(3)).

- 10 -

hold that only general intent is needed."); United States v. Knife, 592 F.2d 472, 482 (8th Cir. 1979) ("Section [113(a)(6)] requires only that the assault shall have resulted in serious bodily harm.") (citing United States v. Eagle, 586 F.2d 1193, 1196 (8th Cir. 1978)).

We agree that a rational jury could find that the blows inflicted by defendant did not cause serious bodily injury and, by definition, did not cause Russell's death. Were this the case, however, the proper verdict would be acquittal, not involuntary manslaughter. See 2 Wayne R. LaFavre & Austin W. Scott, Jr., Substantive Criminal Law § 7.12(c) (1986) ("With manslaughter, as with other crimes defined in terms of cause and result, the defendant's conduct . . . must be the 'legal cause' of the death.") If, on the other hand, the jury believed that the blows contributed to the victim's death, the underlying assault would necessarily have caused "serious bodily injury." The assault would then be a felony under 18 U.S.C. § 113(a)(6) and defendant would not be entitled to an involuntary manslaughter instruction on a misdemeanor-manslaughter theory.

**IV**

Also before us is defendant's next claim that the district court's instruction on aiding and abetting was erroneous. Whether a jury has been properly instructed is a question of law that we review de novo. See United States v. Voss, 82 F.3d 1521, 1529 (10th Cir.), cert. denied, 117 S. Ct. 226 (1996). Our determination is based not on whether the instruction was faultless but whether

the jury was misled in any way and whether it had a proper understanding of the issues. See id.

The district court instructed the jury that:

[I]f another person is acting under the direction of the defendant, or if the defendant joins another person and performs acts—acts with the intent to commit a crime, then the law holds the defendant responsible for the acts and conduct of such other persons, just as though the defendant had committed the acts or engaged in such conduct.
    Notice, however, that before the defendant may be held criminally responsible for the acts of others, it is necessary that the accused deliberately associate himself in some way with the crime and participate in it with the intent to bring about the crime.
    Of course, mere presence at the scene of a crime and knowledge that a crime is being committed are not sufficient to establish that the defendant either directed or aided and abetted the crime, unless you find beyond a reasonable doubt that the defendant was a participant and not merely a knowing spectator.
    In other words, you may not find the defendant guilty unless you find beyond a reasonable doubt that every element of the crime charged in the indictment and as defined in these instructions was committed by some other person or persons and that the defendant voluntarily participated in its commission with the intent to violate the law.

R., Vol. XII, at 353-54. Defendant objected to the language of this instruction, requesting instead that the jury be instructed that "[i]t is not enough that Arvin Benally merely associated with Jonathan Benally, or was present at the scene of the crime, or unknowingly or unintentionally did things that were helpful to the principal." Appellant's Br. at 32. Defendant argues that the charge given to the jury failed to instruct that defendant's "unknowing or unintentional help to Jonathan Benally did not constitute aiding and abetting." Id. We reject that view.

- 12 -

The district court's instruction clearly required the jury to find that defendant deliberately associated himself with the crime and participated with the requisite intent. As such, the instruction is a proper statement of the law and is not misleading.

**V**

We now turn to defendant's assertion that the district court erred in refusing to suppress statements he made during two interviews with police investigators on October 5, 1995. Defendant urges that the statements were made during custodial interrogations before he had been informed of his rights under Miranda v. Arizona, 384 U.S. 436 (1966), and that his statements were involuntary.

The ultimate inquiry in deciding whether a suspect is in custody for purposes of administering Miranda warnings "is simply whether there is a 'formal arrest or restraint on the freedom of movement' of the degree associated with a formal arrest." California v. Beheler, 463 U.S. 1121, 1125 (1983) (per curiam) (quoting Oregon v. Mathiason, 429 U.S. 492, 495 (1977) (per curiam)); see United States v. Chalan, 812 F.2d 1302, 1306 (10th Cir. 1987). "If, from an objective viewpoint, someone in [defendant's] position would reasonably believe her freedom of action had been curtailed to a 'degree associated with a formal arrest,' then she would be held in custody during the interrogation." United States v. Griffin, 7 F.3d 1512, 1518 (10th Cir. 1993) (quoting Beheler, 463 U.S.

- 13 -

at 1125 and <u>Berkemer v. McCarty</u>, 468 U.S. 420, 440 (1984)) (footnote omitted). Because the determination of custody is "necessarily fact intensive," we review the district court's determination that defendant was not in custody for purposes of <u>Miranda</u> for clear error. <u>See</u> <u>United States v. Glover</u>, 104 F.3d 1570, 1578 (10th Cir. 1997).[6] On review of the record we do not see clear error.

On the morning of October 5, 1995, investigating Officer Tolbertson spoke to Julia Benally, the defendant's mother. He requested that she come to the Navajo Department of Safety and that she bring any members of the household present the night Russell was killed. (At the suppression hearing, Tolbertson testified that he had made the request because the Benally's house was near the hill where the victim's body was found and he was hoping that someone living there had seen or heard something helpful to the investigation.) Arvin Benally, accompanied by his mother, went to the investigator's office. The subsequent interview lasted twenty to thirty minutes and was conducted in an interview room by plain-clothes investigators. Following the interview, defendant went home with his mother.

Defendant points to his mother's testimony that she felt compelled to attend the initial interview. He contends that, by demanding his mother's presence at the police station, Officer Tolbertson curtailed his freedom of action as well. Upon

---

[6]We note that the parties do not challenge this circuit's standard of review for "in custody" determinations.

consideration of that testimony, the district court found that it had "not received evidence of the nature that would indicate that Arvin himself heard anything other than his mom saying that they needed to go to the police station. I don't believe that that rises to the level of coercive police action." Supp. R. at 132. Although the testimony presented at the suppression hearing was not entirely consistent, Arvin conceded he was not present when Tolbertson spoke with Julia Benally, and we determine that the district court's conclusion was not clearly erroneous.

Later that day, the investigators asked Arvin to return to their offices. When he did so, Arvin was told that his earlier statement did not make sense. The investigators testified that Arvin was informed of his <u>Miranda</u> rights and subsequently produced a statement admitting that he had been present at Russell's murder. Arvin was at the police station for approximately one-and-a-half hours.

Defendant insists he was interrogated during this second interview prior to receiving the <u>Miranda</u> warning. There is adequate evidence to the contrary. At the hearing on the motion to suppress, Officer Tolbertson testified that the defendant was informed of his rights before making his statement. On independent evaluation of the record, we conclude that defendant was properly informed of his rights before this second interview.

Nor do we agree that defendant's statements made at both interviews were involuntary. Whether a confession is coerced depends upon several factors: (1) the age, intelligence, and education of the defendant; (2) the length of the

- 15 -

detention; (3) the length and nature of the questioning; (4) whether the defendant was advised of her constitutional rights; and (5) whether the defendant was subjected to physical punishment. Glover, 104 F.3d at 1579 (citing Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973)). This determination is based on the totality of the surrounding circumstances. No single factor is determinative. Id. "[I]t is the duty of this court 'to examine the entire record and make an independent determination of the ultimate issue of voluntariness.'" Id. (quoting Davis v. North Carolina, 384 U.S. 737, 741-42 (1966)).

On review of the record we conclude that defendant's actions were voluntary. The lack of evidence of susceptibility to coercion, the relatively short duration of the two interviews, the non-coercive environment in which he was interviewed, Officer Tolbertson's careful and methodical explanation of defendant's Miranda rights to him, which included defining the term "coercion" for him, and the interviewing officers denial that defendant was threatened collectively belie a claim of coercion.

## VI

Defendant takes issue with the district court's refusal to suppress evidence obtained by allegedly coercive means. Shortly after Arvin's second interview, Officer Tolbertson requested that defendant provide him with the clothes that he had worn on the night Russell was killed; defendant persists that he felt that he

did not have a choice but to do so, and thus the evidence should have been suppressed.

We review the district court's denial of defendant's motion to suppress for clear error, considering the evidence "in the light most favorable to the district court's ruling." United States v. Soto, 988 F.2d 1548, 1551 (10th Cir. 1993). Defendant brings two arguments in support of this claim. We are unpersuaded by either. His argument that because the preceding interviews were coercive, he could not have voluntarily consented to the seizure of his clothing fails on our prior conclusion that the interviews were uncoerced. His claim that giving the clothing to Officer Tolbertson was not voluntary because he was not informed of his right to refuse fails as well. The failure to inform defendant that he had the right to refuse a requested production is not, by itself, determinative of coerciveness. See United States v. Manuel, 992 F.2d 272, 275 (10th Cir. 1993). Although Arvin testified at the suppression hearing that he did not feel that he had a choice, Officer Tolbertson testified that he merely asked Arvin for the clothing and Arvin voluntarily complied. Considering the evidence in the light most favorable to the district court's decision we do not see clear error.

**VII**

Because we have concluded that the district court erred in refusing to instruct the jury on self-defense and on the lesser included offense of involuntary

manslaughter, we REVERSE defendant's conviction and REMAND this case for a

new trial.  We affirm as to all remaining issues.

No. 96-2291, U.S. v. Arvin Benally

Judge McWillliams dissents.

Russell John was beaten to death by repeated blows from "fists" and "kicks" delivered to his face and head area. As a result of the beating, his facial features were described as being "beyond recognition."

Arvin Benally and his nephew, Jonathan Benally, were jointly charged in a one-count indictment with the first degree murder of Russell, in violation of 18 U.S.C. §§ 1111(a) and 1153. Each was also charged therein with aiding and abetting the other in violation of 18 U.S.C. § 2. Arvin Benally's motion for a separate trial was granted.

Jonathan Benally was tried first, and a jury convicted him of second degree murder. On appeal, we have this date affirmed his conviction therefor. In so doing, we held, *inter alia,* that the district court did not err in refusing to instruct the jury on involuntary manslaughter. In thus holding, we observed that there was "no evidence to support a rational jury finding that defendant [Jonathan Benally] was acting in self-defense, even if imperfectly or unlawfully."

In a subsequent trial, Arvin Benally was convicted by a jury of voluntary manslaughter. On appeal, the majority of this panel now reverses Arvin Benally's conviction on the ground that the district court erred in not giving an instruction on self-defense and on involuntary manslaughter. I disagree.

Certainly, the overwhelming evidence, in my view, is that the Benallys, and not Russell, were the aggressors. Be that as it may, accepting Arvin Benally's testimony at trial that Russell struck the "first blow," it is abundantly clear to me that, as a matter of

law, "excessive force" was thereafter used by the Benallys. I disagree with the statement in the majority opinion that ". . . if Arvin's [Benally's] testimony were credited, the jury could reasonably have believed that the force Arvin used in self-defense was reasonable in the light of the threat presented." In this general connection, it should be remembered that Arvin Benally, in addition to being charged as a "principal," was also charged with aiding and abetting his nephew, Jonathan Benally. If he was so aiding and abetting, and certainly the evidence viewed in a light most favorable to the government indicated that he was, then Jonathan Benally's acts were Arvin's acts. Further, the fact that Russell was beaten "to a pulp," so to speak, causing death, suggests to me, and strongly so, that the force used by Arvin and his nephew was, as a matter of law, unreasonable and excessive. *See United States v. Scalf,* 725 F.2d 1271 (10th Cir. 1984), where we approved an instruction to the effect that the force which may be justified when acting in self-defense must be reasonable under the circumstances to save life or avert serious bodily harm.

If an instruction on self-defense was not required, it follows that an instruction on involuntary manslaughter was not required. *See United States v. Jonathan Benally,* \_\_\_\_ F.3d \_\_\_\_ (10th Cir. 1998), decided this date, and *United States v. Hatatley,* 130 F.3d 1399 (10th Cir. 1997).