**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Michael Joseph BROWN, Defendant–Appellant.**

No. 01–6072.

United States Court of Appeals,
Tenth Circuit.

April 22, 2002.

---

Paul Antonio Lacy, Assistant Federal Public Defender, Oklahoma City, OK, for Defendant–Appellant.

Randal A. Sengel, Assistant United States Attorney (Daniel G. Webber, Jr., United States Attorney, with him on the brief), Oklahoma City, OK, for Plaintiff–Appellee.

Before SEYMOUR, Circuit Judge, BRORBY, Senior Circuit Judge, and EBEL, Circuit Judge.

SEYMOUR, Circuit Judge.

Michael Joseph Brown stabbed John Roy in the chest and was indicted on one count of second degree murder in violation of 18 U.S.C. § 1111(a) and 18 U.S.C. § 1153(a).[1] After a jury trial, he was con-

---

1. It is undisputed that both Mr. Brown and John Roy were Indians and that the events

victed of the lesser included offense of voluntary manslaughter and sentenced to ninety-seven months in prison and three years of supervised release. Mr. Brown appeals, contending the district court erred (1) in overruling his motion to suppress the inculpatory statements he made during interrogation by an agent of the Federal Bureau of Investigation (FBI); (2) in refusing to instruct the jury on the lesser included offense of involuntary manslaughter; (3) in its instruction explaining the elements of voluntary manslaughter; and (4) in determining his sentence. We reverse.

## I

Mr. Brown lived with his mother, Antoinette LeClair Brown, her niece, Irma Pratt, Ms. Pratt's common law husband, John Roy, and several children in Ms. Pratt's apartment in White Eagle, Oklahoma. White Eagle is a small Ponca Tribal community near Ponca City consisting mainly of the Ponca Tribal Housing Authority apartment complex in which Ms. Pratt's apartment was located. Mr. Brown, who was twenty-one years old at the time, spent the afternoon before the stabbing with his thirteen year-old cousin riding bikes, swimming, setting off fireworks and shooting BB guns near White Eagle.

In the late afternoon, Mr. Brown returned to White Eagle, obtained some money from his mother, and asked Mr. Roy to run him over to a convenience store to buy beer. When they got back, he took the beer to the home of his girlfriend, Goldie Clark, who lived in a nearby apartment in the complex. Between 7:00 and 8:00 p.m. that evening, Mr. Brown returned to Irma's apartment and sat on the porch drinking beer. Ms. Pratt and Mr. Roy returned from town around 9:00 p.m. and Mr. Roy joined Mr. Brown on the porch, drinking beer and peppermint schnapps. Mr. Brown's mother, who had been drinking most of the afternoon and was intoxicated, joined them briefly, drank two beers, and went back to bed. Ms. Pratt was inside, housecleaning, until around midnight when it began to rain. She called the men in and they all began drinking and singing along with a tape of "49" songs, which are Indian music with English words used on occasion as drinking songs.

The friendly atmosphere began to change after Mr. Brown talked to Ms. Pratt about his two girlfriends and Mr. Roy began to criticize Mr. Brown for having relationships with both girls. The events that followed are subject to dispute and clouded by the fact that the parties had been drinking steadily for several hours and could not remember things clearly. Irma Pratt testified at trial that Mr. Brown became upset over Mr. Roy's remarks, and that Mr. Roy realized he had upset Mr. Brown and tried unsuccessfully to make amends. At some point, Mr. Brown went into the kitchen, where he

occurred within Indian country as defined in 18 U.S.C. § 1151. Under 18 U.S.C. § 1153(a), any Indian who commits, inter alia, the offenses of murder or manslaughter against another Indian within Indian country "shall be subject to the same laws and penalties as all other persons committing [such] offenses, within the exclusive jurisdiction of the United States." The statute defining the federal crime of second degree murder provides:

Murder is the unlawful killing of a human being with malice aforethought. Every murder perpetrated by poison, lying in wait, or any other kind of willful, deliberate, malicious, and premeditated killing . . . is murder in the first degree.

Any other murder is murder in the second degree.

18 U.S.C. § 1111(a).

obtained a knife and hid it along his forearm. He returned to the living room and hid the knife in the chair cushions. Mr. Brown testified that he and Mr. Roy had had problems before, and that several weeks earlier Mr. Roy had ordered him to leave the apartment, shoved him, and took a swing at him. Mr. Brown stated that he got the knife to protect himself from Mr. Roy coming toward him, and to scare Mr. Roy. Mr. Brown was five feet seven inches tall and weighed 150 pounds. Mr. Roy was forty-one years of age, and was described as between six feet and six feet two inches tall and as weighing approximately 240 pounds.

Mr. Brown left the living room a second time, went through the kitchen to his bedroom, and then returned to the living room, still upset. Mr. Brown testified he left a third time to go to his room, taking the knife with him to return it to the kitchen drawer. It is undisputed that Mr. Roy followed Mr. Brown into the kitchen while Irma remained in the living room. Mr. Brown testified that as Mr. Roy followed him into the kitchen, Mr. Roy grabbed him from behind by the shoulder. Mr. Brown stated that he had the knife in his hand ready to put it back in the drawer when Mr. Roy grabbed his shoulder, and that as he turned around, Mr. Roy swung at him and he swung at Mr. Roy with the hand holding the knife. He testified that he did not mean to stab Mr. Roy but was trying to hit him with his fist. The knife blade went into Mr. Roy's chest and pierced his heart. He was subsequently transported to a hospital emergency room where he died a short time later.

Mr. Brown testified that he did not immediately realize he had stabbed Mr. Roy, and that he woke up his mother to tell her Mr. Roy was picking on him. When Ms. Pratt came into the kitchen to bring Mr. Roy back to the living room, she saw blood on his shirt and discovered he had been stabbed. Mr. Brown's mother came into the kitchen and grappled with Mr. Roy until Ms. Pratt pulled her back. Ms. Pratt ordered Mr. Brown, who was crying, to leave and he did so, going to Goldie Clark's apartment.

Goldie Clark's son Anthony testified that Mr. Brown gave him the knife and told him to hide it, and then went back to Irma Pratt's house to get some clothes and his radio. When Mr. Brown returned, he told Anthony to get the knife and wash it. Anthony washed the knife and his brother hid it in a kitchen drawer.

Mr. Brown was discovered by the police at Ms. Clark's apartment. He was arrested and taken to the Ponca Tribal Police station. At the time of his arrest, Mr. Brown was still intoxicated but able to walk. The booking officer read him a *Miranda* advisement and waiver form, asked him to respond, and filled in his answers. Mr. Brown's affirmative responses to three questions on the form were the basis of his motion to suppress.[2] Although Mr. Brown was not questioned at that time, shortly after he was placed in a holding cell he agreed to accompany police officers back to the apartment complex and help them find the knife. The knife was recovered from Goldie Clark's kitchen.

---

**2.** The form provided in pertinent part as follows:

Keeping your rights in mind, do you wish to answer questions now without a lawyer present? Yes_____ No_____

Do you want a lawyer? Yes_____ No_____

Do you want to talk to a lawyer? Yes_____ No_____

Rec. vol. 1, doc. 20, Gov't Ex. 1. Mr. Brown answered yes to all three questions.

The next morning Mr. Brown was interviewed by Raymond Hammergren, a special agent with the FBI. Prior to the interview, a Tribal Police officer told Agent Hammergren that Mr. Brown had been read his *Miranda* rights, although the agent did not see the completed form. After Agent Hammergren again informed Mr. Brown of his rights and answered Mr. Brown's questions about his right to an attorney, Mr. Brown agreed to talk with the agent and signed the waiver. Mr. Brown was not informed of Mr. Roy's death, and the interview was not recorded.

Agent Hammergren testified that Mr. Brown originally said he stabbed Mr. Roy after Mr. Roy assaulted him with a baseball bat, and then said he stabbed Mr. Roy to protect his mother. After Agent Hammergren indicated that these stories were not consistent with the statements from other witnesses, Mr. Brown gave the following version of events. He said he had been angry with Mr. Roy for a couple weeks because Mr. Roy had made derogatory statements about him to one of Mr. Brown's girlfriends, and that he was also upset over Mr. Roy's comments the night of the stabbing about Mr. Brown's involvement with two women. He refused to accept Mr. Roy's apology that night and remained angry. Mr. Brown stated that at some point during his discussion with Mr. Roy he went into the kitchen and got a knife, and that he stabbed Mr. Roy when Mr. Roy followed him into the kitchen. According to the agent, Mr. Brown stated that Mr. Roy was unarmed and that the two never took swings at each other. Mr. Brown denied intending to kill Mr. Roy, but told the agent that he intended to hurt and scare him.

## II

Mr. Brown filed a motion to suppress the statements he made to Agent Hammergren, contending the agent violated his rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), by questioning him after he had requested an attorney.[3] The district court held an evidentiary hearing and denied the motion to suppress. The court agreed with Mr. Brown that under *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), when a suspect invokes his right to have counsel present during a custodial interrogation, law enforcement officials cannot thereafter initiate questioning in the absence of counsel even if they again advise the suspect of his rights. The court concluded, however, that *Edwards* did not apply because Mr. Brown's request for counsel after his arrest had not been clear and unequivocal. The court further held that because Mr. Brown had knowingly waived his rights prior to his interrogation by Agent Hammergren, his statements were admissible.

■■■ Upon review of the denial of a motion to suppress, we accept the district court's findings of fact unless they are clearly erroneous. *See United States v. Zamora*, 222 F.3d 756, 765 (10th Cir.2000). "When reviewing an invocation of the right to counsel, specifically, 'we review for clear error the district court's factual findings concerning the words a defendant used in invoking the right to counsel. Whether those words actually invoked the right to counsel is a legal determination, reviewed de novo.'" *Id.* (quoting *United States v. March*, 999 F.2d 456, 459 (10th Cir.1993)).

---

**3.** The government agreed not to offer any evidence of Mr. Brown's activities or statements when he returned to the crime scene with the Tribal police officers to recover the knife. The admission of that evidence is therefore not before us on appeal. The knife itself was offered into evidence and identified at trial by Anthony Clark, who had accepted the knife from Mr. Brown and later washed it.

In *Edwards,* the Supreme Court stated that

> when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights. We further hold that an accused, . . . having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police.

451 U.S. at 484–85, 101 S.Ct. 1880 (footnote omitted). The Court revisited *Edwards* in *Davis v. United States,* 512 U.S. 452, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994), to "decide how law enforcement officers should respond when a suspect makes a reference to counsel that is insufficiently clear to invoke the *Edwards* prohibition on further questioning." *Id.* at 454, 114 S.Ct. 2350. The Court held that a request for counsel must not be "ambiguous or equivocal." *Id.* at 459, 114 S.Ct. 2350. "[I]f a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, our precedents do not require the cessation of questioning." *Id.*

In this case, the Tribal Police waiver-of-rights form indicates that Mr. Brown answered "yes" when asked if he would an-

swer questions without a lawyer present, but also answered yes when asked if he wanted a lawyer and if he wanted to talk to a lawyer. *See* rec. vol. 1, doc. 20, Gov't Ex. 1. Although Mr. Brown concedes on appeal "that his responses to the *Miranda* warnings were not clear and unambiguous," Brief of Aplt. at 24, he nonetheless argues that his statements to Agent Hammergren should have been suppressed, contending the police should have made an effort to clarify his responses.

■ Although the Court in *Davis* observed that "when a suspect makes an ambiguous or equivocal statement it will often be good police practice for the interviewing officers to clarify whether or not he actually wants an attorney," the Court declined "to adopt a rule requiring officers to ask clarifying questions." *Davis,* 512 U.S. at 461, 114 S.Ct. 2350. We agree with Mr. Brown that the circumstances surrounding his *Miranda* warnings indicate that clarifying questions would have been desirable.[4] Mr. Brown's warnings were administered at 2:00 a.m. while he was intoxicated, and his answers to the questions designed to protect his right to counsel were plainly and directly contradictory.[5] As the Supreme Court has pointed out, "[c]larifying questions help protect the rights of the suspect by ensuring that he gets an attorney if he wants one, and will minimize the chance of a confession being suppressed due to subsequent judicial second-guessing as to the meaning of the suspect's statement regarding counsel." *Id.* Nonetheless, the Court has held that clarifying questions are not required

---

4. We also point out that the three questions which created the problem in this case are redundant and thus likely to elicit contradictory responses.

5. We note, however, there is evidence in the record that the Tribal Police officer who pro-

cessed Mr. Brown's incarceration viewed giving Mr. Brown his *Miranda* rights as part of the booking procedure, and that the police did not intend to question Mr. Brown at that time.

and we are not at liberty to impose such a requirement here. Accordingly, we conclude that Mr. Brown's ambiguous responses did not invoke his right to counsel upon his arrest and incarceration at the Tribal Police station, and his *Miranda* rights were not violated under *Edwards* when Agent Hammergren questioned him the next morning.

Mr. Brown also asserts his waiver of the right against self-incrimination was not knowing and voluntary. The district court rejected this argument, finding that nothing in the circumstances of Mr. Brown's arrest, incarceration, or questioning by Agent Hammergren rendered his statements to the agent involuntary. "In reviewing a district court's denial of a motion to suppress a statement or confession, we accept the district court's underlying factual findings unless they are clearly erroneous. The ultimate issue of whether a statement was voluntary is question of law which we review *de novo.*" *United States v. Nguyen,* 155 F.3d 1219, 1222 (10th Cir. 1998).

■ A suspect who has been advised of his right against self-incrimination may waive that right "provided the waiver is made voluntarily, knowingly, and intelligently." *Miranda,* 384 U.S. at 444, 86 S.Ct. 1602.

First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it. *United States v. Hernandez,* 913 F.2d 1506, 1509 (10th Cir.1990).

A determination of voluntariness is based on the totality of the circumstances. We examine several factors including the characteristics of the suspect, such as his age, intelligence, and education, and the details of the interrogation, such as whether the suspect was informed of his rights, the length of the detention and the interrogation, and the use or threat of physical force.

*Nguyen,* 155 F.3d at 1222. Although Mr. Brown faults the district court for failing to address several of these factors, he does not explain how they rendered his statements involuntary. The district court recognized that Mr. Brown was intoxicated when he was arrested and first given his *Miranda* warnings but, as the court pointed out, Mr. Brown was not questioned at that point. Although shortly thereafter Mr. Brown was taken back to the crime scene to help recover the knife, no evidence pertaining to his participation in that activity was admitted at trial. When Agent Hammergren arrived the next morning to interrogate Mr. Brown, he had slept for several hours, did not appear intoxicated, and was again given his *Miranda* warning. Our review of the record convinces us that Mr. Brown's statements to Agent Hammergren were voluntarily given.

■ Mr. Brown places great significance on the fact that he was not told prior to his interrogation that John Roy had died. He argues his waiver was not knowing and voluntary because he was not fully aware of the nature of the right being abandoned or the consequences of his decision to abandon it. The law is to the contrary. A waiver is not invalid "merely because the police did not inform Defendant of all the potential charges that could be brought against him." *Nguyen,* 155 F.3d at 1222 (citing cases); *see also Colorado v. Spring,* 479 U.S. 564, 577, 107 S.Ct. 851, 93 L.Ed.2d 954 (1987) (police failure to inform suspect of subject matter of interrogation affected only wisdom of waiv-

er, not its essentially knowing and voluntary nature). We are not persuaded the district court erred in denying Mr. Brown's motion to suppress the statements he made to Agent Hammergren.

### III

Mr. Brown maintains that the trial court erred in refusing to give his requested instruction on the lesser included offense of involuntary manslaughter. His defense theory was that he acted in self-defense in a criminally negligent manner in causing the death of John Roy. The district court denied the request, stating that the jury could not reasonably return a verdict of involuntary manslaughter on the evidence.

A defendant seeking a lesser included offense instruction must satisfy four criteria. *See United States v. Humphrey,* 208 F.3d 1190, 1206 (10th Cir.2000); *United States v. Yazzie,* 188 F.3d 1178, 1185 (10th Cir.1999). First, the defendant must make a proper request; second, the lesser included offense must contain some but not all of the elements of the charged offense; third, the elements differentiating the two offenses must be in dispute; and fourth, the evidence must allow the jury to rationally acquit the defendant on the greater charge and convict on the lesser charge. *See Yazzie,* 188 F.3d at 1185. While we have held that a trial court's decision on whether the evidence justifies a lesser included offense instruction is reviewed for an abuse of discretion, we have also pointed out that "[t]his ... is no broad ranging discretion but is focused narrowly on whether there is any evidence fairly tending to bear on the lesser included offense." *Humphrey,* 208 F.3d at 1206. "[A] defendant is always entitled to an instruction giving his theory of defense if supported by the evidence." *Yazzie,* 188 F.3d at 1185 (quoting *United States v. Moore,* 108 F.3d 270, 273 (10th Cir.1997)).

"In conducting this review, we must give full credence to defendant's testimony." *Id.* Moreover, the defendant is entitled to the instruction even if the evidence supporting it is weak and "depends on an inference of a state of facts that is ascertained by believing defendant as to part of his testimony and prosecution witnesses on the other points in dispute." *Humphrey,* 208 F.3d at 1207–08.

Mr. Brown easily satisfied the first two elements of the lesser included offense inquiry. First, he made a proper request for the involuntary manslaughter instruction. Second, involuntary manslaughter is a lesser included offense of second degree murder, the crime with which he was charged. *See United States v. Begay,* 833 F.2d 900, 901 (10th Cir.1987).

We also conclude Mr. Brown met the third prerequisite, which requires that the element differentiating the two offenses be in dispute. Second degree murder and involuntary manslaughter both involve the unlawful killing of a human being. *See United States v. Wood,* 207 F.3d 1222, 1228 (10th Cir.2000). "The difference between them is the requisite mens rea." *Id.* Second degree murder is a general intent crime requiring malice aforethought, an element that may be established, inter alia, " 'by evidence of conduct which is reckless and wanton, and a gross deviation from a reasonable standard of care, of such a nature that a jury is warranted in inferring that defendant was aware of a serious risk of death or serious bodily harm.' " *Id.* (quoting *United States v. Soundingsides,* 820 F.2d 1232, 1237 (10th Cir.1987)). "The concepts of 'depraved heart' and 'reckless and wanton, and a gross deviation from a reasonable standard of care' are functionally equivalent in this context." *Id.* Involuntary manslaughter, as applicable to this case, is "the unlawful killing of a human

being without malice ... in the commission in an unlawful manner, or without due caution and circumspection, of a lawful act which might produce death." 18 U.S.C. § 1112(a). "The defendant's acts must amount to 'gross negligence,' defined as 'wanton or reckless disregard for human life.'" *Wood*, 207 F.3d at 1228.

■ As the cited authorities demonstrate, while "[t]he distinction between involuntary manslaughter and second-degree murder is that the former does not require malice aforethought [, t]he definitions of 'malice aforethought' and 'without due care and circumspection' developed in our case law ... use overlapping terminology: both refer to 'reckless and wanton' behavior." *Id.* at 1229. "The substantive distinction is the severity of the reckless and wanton behavior: Second-degree murder involves reckless and wanton disregard for human life that is extreme in nature, while involuntary manslaughter involves reckless and wanton disregard that is not extreme in nature." *Id.* (citing cases); *see also Yazzie*, 188 F.3d at 1187 n. 20 (in instructing on involuntary manslaughter, court must distinguish extreme mental state evincing wanton or reckless disregard for human life allowing inference of malice aforethought from less extreme state of mind required for lesser included offenses).

■ The government's theory of the case was that Mr. Brown was angry with Mr. Roy, that he intended to use the knife and to inflict the wound, and that the force he used was fueled by rage and anger. The government argued to the jury that Mr. Brown's acts were callous, wanton and reckless. In requesting an instruction on involuntary manslaughter, Mr. Brown asserted that the death of Mr. Roy occurred during an imperfect self-defense, i.e., that Mr. Brown inadvertently caused the death while defending himself, a lawful act, but did so in an unlawful manner by using excessive force. Whether Mr. Brown acted with the extreme recklessness and wantonness necessary to establish malice aforethought is therefore the disputed element here.

We thus turn to the fourth criteria governing a defendant's entitlement to a lesser included offense to determine whether a jury could rationally convict Mr. Brown of second degree manslaughter and acquit him of second degree murder. In making this assessment, we bear in mind that the instruction must be given if there is any evidence to support it, even if that evidence is weak and contradicted, that we must give full credence to Mr. Brown's testimony, and that "there may be some evidence of a lesser offense *even though this depends on an inference of a state of facts that is ascertained by believing defendant as to part of his testimony and prosecution witnesses on the other points in dispute.*" *Humphrey*, 208 F.3d at 1208 (quoting *Belton v. United States*, 382 F.2d 150, 155 (D.C.Cir.1967), and omitting citations and internal quotations, and adding emphasis).

■ Our cases recognize that under section 1112(a), a defendant may commit involuntary manslaughter if he acts in self-defense but is criminally negligent in doing so. *See, e.g., Yazzie*, 188 F.3d at 1186; *United States v. Benally*, 146 F.3d 1232, 1237 (10th Cir.1998); *Begay*, 833 F.2d at 901. In *Yazzie* we held that an involuntary manslaughter instruction was required when, during a melee involving several participants, the defendant stabbed the victim three times after the victim was knocked to the ground. Evidence supporting the instruction included the victim's threatening body language, his violent nature, the defendant's belief that the victim was armed, the fact that the defendant was five feet six inches tall and weighed 180 pounds while the victim was six feet five

inches tall and weighed 280 pounds, and the fact that all of the participants had been drinking. We held this evidence sufficient to support the instruction despite evidence of the brutality of the attack, evidence that the victim was just searching for a "party," and testimony tending to show that the defendant had not seen a weapon or been told about a gun.

In *Benally*, the victim was also killed during a melee involving the defendant and other participants, all of whom had been drinking. We held that an involuntary manslaughter instruction was required by the defendant's testimony that his participation in the fight was minimal, that he struck the victim when the victim punched him only because he did not want to be hit again, and that he did not intend to hurt or kill anyone. We concluded that this evidence supported the instruction despite conflicting testimony that the defendant kicked the victim in the head and side until restrained and hit him in the face until held back.

In *Begay*, we held that an involuntary manslaughter instruction was properly given in view of evidence that the victim and the defendant had been drinking, that the victim hit and shoved the defendant, and that in the ensuing scuffle the defendant drew a hunting knife and the victim was stabbed. We held that the jury could have concluded the defendant did not intend to stab the victim but was guilty of gross negligence in brandishing the knife. In so holding, we relied on *United States v. Iron Shield*, 697 F.2d 845 (8th Cir.1983), in which the court upheld an involuntary manslaughter instruction where the victim was stabbed during an altercation with his wife after a long evening of drinking with family and friends. The victim was in the front yard and asked his wife to bring him a beer. When she opened the door to hand it to him, he grabbed her arm and slammed the door on it several times. She got free, ran to the kitchen some twenty-five feet away, and took a knife from a drawer. She went to the door intending to brandish the knife and scare the victim away from the house and, although she did not remember what happened after she stepped onto the porch, the victim was stabbed in the chest.

The circumstances in the above cases are sufficiently similar to inform our assessment here. As we have observed, at the time of the crime, Mr. Brown was twenty-one years of age, five feet seven inches tall, and weighed 150 pounds. Mr. Roy was forty-one years old, over six feet tall, and weighed 240 pounds. The defense presented evidence that the two men had previously had problems, that Mr. Roy had thrown Mr. Brown out of the house on at least one occasion, and that the police had been involved. There was also testimony that Mr. Roy had shoved Mr. Brown on that occasion, and Mr. Brown testified that they had swung at each other. Goldie Clark testified that the two had gotten into arguments when Mr. Roy was drunk, and Mr. Brown's mother testified that Mr. Roy had an "attitude" toward Mr. Brown and had kicked him out more than once. She stated that Mr. Brown stayed away from Mr. Roy when he was drunk because Mr. Roy got mean. The security guard for the apartment complex testified to hearing about Mr. Roy's propensity for violence and to hearing that it was a common occurrence for Mr. Roy to pick on Mr. Brown. Mr. Brown testified that when Mr. Roy got drunk he liked to fight, and that he, Mr. Brown, got a knife from the kitchen to protect himself, to keep Mr. Roy from coming toward him and to scare him. He testified that he went into the kitchen to return the knife to the drawer and that Mr. Roy followed him in and grabbed him from behind by the shoulder.

Mr. Roy swung at him and he ducked and swung back with the knife in his hand.

We conclude that this evidence, while contradicted to some degree by other testimony and by Mr. Brown's prior statement to Agent Hammergren, is nonetheless sufficient to allow the jury to find that while Mr. Brown was criminally negligent in attempting to defend himself with a knife, he did not act with the extreme reckless and wanton disregard for human life required to support a conviction for second degree murder. The district court erred in taking the mens rea issue from the jury by refusing to instruct on involuntary manslaughter.[6] "*[I]f there be any evidence fairly tending to bear upon the issue of manslaughter, it is the province of the jury to determine from all the evidence what the condition of mind was, and to say whether the crime was murder or manslaughter.*" *Humphrey*, 208 F.3d at 1207 (quoting *Stevenson v. United States*, 162 U.S. 313, 323, 16 S.Ct. 839, 40 L.Ed. 980 (1896) and adding emphasis).

### IV

■■■■ Mr. Brown also contends the district court erred in refusing to give two proffered instructions regarding intoxi-

cation and the intent necessary to commit the crime of second degree murder and the lesser included offense of voluntary manslaughter. To the extent that this issue may arise on retrial, we observe that voluntary intoxication is not a defense to the crime of voluntary manslaughter. *See United States v. Hatatley*, 130 F.3d 1399, 1405 (10th Cir.1997).[7] In addition, Mr. Brown asserts the district court erred in defining voluntary manslaughter by equating heat of passion and sudden quarrel. Because either of these elements negates the malice necessary to constitute second degree murder, *see generally United States v. Lofton*, 776 F.2d 918, 920 (10th Cir.1985), and because Mr. Brown was acquitted of second degree murder, he can show no prejudice from the instruction.

Finally, Mr. Brown challenges the district court's application of the sentencing guidelines. In view of our holding that Mr. Brown must be retried, we need not address his sentencing arguments.

### V

In sum, we **REVERSE** Mr. Brown's conviction for voluntary manslaughter and

---

6. The district court held in part that the imperfect self-defense theory did not apply under the evidence because Mr. Brown's own testimony tends to exclude that as a defense that can be considered in that his proposition is "I never intended to cut or stab at all." Rec. vol. 6 at 196–97. The court erred in determining that an involuntary manslaughter instruction was precluded by Mr. Brown's testimony that he did not intend to use the knife at all. We have cited with approval the Eighth Circuit's contrary analysis of similar circumstances:

> [T]he defendant herself testified that she did not intend to kill her husband, but meant only to brandish the knife to frighten him from their home. The court concluded that this testimony "put in issue whether [the defendant] might have been guilty of gross

negligence in so brandishing the knife, and whether [this] negligence could be sufficient to convict her under that portion of § 1112(a) which refers to a killing 'in the commission ... without due caution and circumspection, of a lawful act which might produce death.'"

*United States v. Begay*, 833 F.2d 900, 902 (10th Cir.1987) (quoting *United States v. Iron Shield*, 697 F.2d 845, 847–48 (8th Cir.1983)).

7. We point out that Mr. Brown may only be retried on the charges of voluntary and involuntary manslaughter because the jury's guilty verdict on the lesser included offense of voluntary manslaughter constituted an implicit acquittal on the charge of second degree murder. *See United States v. Paul*, 37 F.3d 496, 501 (9th Cir.1994).

**REMAND** for a new trial in light of this opinion.