**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**AUG 10 1999**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

      Plaintiff-Appellee,

v.

ALFRED YAZZIE, RAYMOND JONES,

      Defendants-Appellants.

Nos. 98-2149, 98-2155

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**
**(D.C. No. CR-97-478-LH)**

---

E. Justin Pennington, Albuquerque, NM, for Defendant-Appellant Alfred Yazzie.

Marc H. Robert, Albuquerque, NM, for Defendant-Appellant Raymond Jones.

Kathleen Bliss, Assistant U.S. Attorney (John J. Kelly, United States Attorney, and Mary Catherine McCulloch, Assistant U.S. Attorney, with her on the briefs), Albuquerque, NM, for Plaintiff-Appellee United States of America.

---

Before **PORFILIO**, **HENRY**, and **BRISCOE**, Circuit Judges.

---

**PORFILIO**, Circuit Judge.

Raymond Jones and Alfred Yazzie challenge their convictions for second-degree murder and aiding and abetting second-degree murder. We have consolidated the appeals for the purpose of this disposition. Because there was evidence permitting a jury to reasonably conclude the victim was killed by "the commission of an unlawful act not amounting to a felony, *or* in the commission in an unlawful manner, *or* without due caution and circumspection, of a lawful act which might produce death," 18 U.S.C. § 1112(a) (emphasis added), albeit the trial judge refused to so instruct, we reverse their convictions and remand for a new trial.[1]

## I. Background

The acts culminating in indictments for second-degree murder extravasate from a series of seemingly random encounters within a corner of the Navajo Nation, an expanse of sparsely populated northwest New Mexico including the towns of Shiprock, Hogback, and Farmington. Raymond Jones and Alfred Yazzie, related by clan, are members of the Navajo Nation. On June 26, 1997, the two prepared to drive to Safford, Arizona, where Jones planned to pick up a new motorcycle his girlfriend, Doreen Tanner, had purchased for him. Late that evening, Mr. Jones, the president of the Norbanos, a Navajo motorcycle club, received a telephone call from Brenda Charley in Shiprock telling him a big guy with tattoos calling himself Eagle had come to her home asking for a biker he

---

[1] Necessarily our decision impacts Mr. Yazzie's conviction based on the government's theory he aided and abetted in the second-degree murder of the victim.

knew in prison named Turtle. Ms. Charley told Jones that Eagle was headed back to the Zia Bar, a local spot frequented by Navajo bikers, to find members of his motorcycle club, the Banditos, and party.

Curiosity led Jones, accompanied by Yazzie and Tanner, to the Zia Bar to check out Ms. Charley's call. Although Eagle was not there, Curtis Benally was and filled in details about Eagle's visit, telling Jones that Eagle had left with Nolan Charley, headed for his cousin-brother Harrison Blueeyes' trailer in Hogback between Shiprock and Farmington. Jones and his two companions then drove to Harrison Blueeyes' place where he was told Eagle wanted to meet him and was waiting at a Seven-to-Eleven store in Shiprock. The five, Charley and Blueeyes in one vehicle and Jones, Yazzie and Tanner in another, drove to the Seven-to-Eleven and spotted a car facing out parked at the far end of the parking lot. As they drove in, the car's headlights flashed. They parked and got out. Eagle, six feet five and weighing 280 pounds, emerged from his car and, in the ensuing encounter, was struck to the ground. Four days later upon returning from Safford, Mr. Yazzie read in the newspaper that the individual tribal police found in the Seven-to-Eleven parking lot in the early hours of June 27th was dead.

A grand jury indicted Jones and Yazzie for unlawfully killing Thomas Briggs, also known as Eagle, in violation of 18 U.S.C. §§ 1153,[2] 1111,[3] and 2. During the seven days

---

[2]18 U.S.C. § 1153 states, in part:

Any Indian who commits against the person or property of

(continued...)

of their joint trial, the government and defense counsel airbrushed in and out various details to provide context and meaning to this otherwise random confrontation among strangers.

From the government's perspective, for the ten months before he died, Thomas Briggs lived in Low Mountain, Arizona, just over the New Mexico border with his girlfriend, Gloria Begay. Ms. Begay testified that on the morning of June 26, 1997, as she and Eagle[4] contemplated hitchhiking into Holbrook to pawn a watch to buy groceries, Jerome Begay, Eagle's friend who lived outside Low Mountain, arrived and asked Eagle to accompany him to Shiprock. She testified Jerome, "a trouble maker," was already intoxicated but offered to drive Eagle to Shiprock in exchange for Eagle's backing him up

---

[2](...continued)
> another Indian or other person any of the following offenses, namely, murder, manslaughter . . . within the Indian country, shall be subject to the same laws and penalties as all other persons committing any of the above offenses, within the exclusive jurisdiction of the United States.

[3]18 U.S.C. § 1111 states, in part:

> Murder is the unlawful killing of a human being with malice aforethought. Every murder perpetrated . . . from a premeditated design . . . to effect the death of any human being other than him who is killed, is murder in the first degree.

> Any other murder is murder in the second degree.

[4]Ms. Begay testified on direct examination that Thomas Briggs' nickname, Eagle, was "the only name he went by; everybody knew him as Eagle."

in case he had trouble getting his stolen car back.

Jerome Begay testified after he and Eagle finished a gallon of moonshine, the two began drinking beer and then drove into Shiprock. Although his explanation for the trip varied,[5] the two first stopped at the Office Bar in Farmington where Eagle began asking for bikers named either Mongo or Turtle. When Eagle punched a patron, he was asked to leave. At the Top Deck Bar, Begay said, after an argument, bouncers chased Eagle out. The two then drove to the Thriftway in Shiprock and bought more beer[6] before stopping at the Zia Bar. Begay stated Eagle went in alone and asked the bartender where he could find some "bikers bros" and party. On cross-examination, Begay stated he was pretty drunk when the two barhopped and waited in the car when Eagle went into the Zia Bar because he did not want to be seen with him.[7]

Jerome Begay described leaving the Zia Bar with Eagle and Nolan Charley and driving to get Charley's car. Begay and Eagle then followed Charley back to Shiprock and into the Seven-to-Eleven parking lot where Charley told the two to wait. Begay

---

[5]His testimony wavered between driving to Shiprock to buy parts for his car to wanting to get "his stuff back" and needing back-up.

[6]At the Thriftway, Eagle struck up a conversation with Vicki Yellowhorse who took Briggs and Begay to ask her aunt, Brenda Charley, about his friend, Turtle, "that Turtle has a brother that was in the biker gang." Eagle told Vicki Yellowhorse and Brenda Charley he was Native American, half Sioux, and was married to a "squaw."

[7]Darrell Yellowhorse testified when he took Eagle to ask his aunt Brenda Benally about bikers, he could tell Jerome Begay was afraid of Briggs. Nolan Charley who rode with Jerome Begay and Briggs to find bikers testified he jokingly asked Begay if he was being held hostage and stated Begay looked scared.

testified when the fray erupted, his passenger seat was fully reclined "because I know I was getting drunk on the liquor." He heard Eagle say something like, "Hello, brother," but saw nothing. He testified he also "heard bones being broken . . . flesh, something like that." After the melee, Begay, drunk and disoriented, left Eagle, driving past the tribal police station before reaching his father's house. There, Jerome convinced his sixteen-year-old daughter to return to the Seven-to-Eleven with him, and she helped him call the police.

The government's forensic pathologist, Dr. Rebecca Irvine, testified, describing Briggs and the injuries he sustained. She stated that Briggs, 72.5 inches and weighing 280 pounds, had thirty-nine or forty tattoos covering his body, some dense and indecipherable, others depicting shackled human figures, daggers, swastikas, a devil's head, and a teardrop by his eye, a gang sign signifying he had killed someone.[8] Dr. Irvine described Briggs' injuries, graphically illustrated with photographs, explaining that severe blows to the head fractured the skull bones and blackened Briggs' eyes. Briggs' right ear was torn through, and he sustained a bruise on his testicles. Dr. Irvine described several superficial stab wounds but concluded that grievous and massive head injuries produced by a blunt instrument caused the death.

Further, the government called F.B.I. Agent Frank Chimits, the primary

---

[8]Witnesses testified Briggs had the words "Fuck you," tattooed on the inside of his lower lip. Briggs' genitalia were also tattooed.

investigator of the homicide. He testified Curtis Benally stated he did not see Eagle carrying a gun, and neither Jones nor Yazzie told him Eagle had a gun. He would not speculate, he stated, about a motive and considered each participant a potential suspect during the course of his investigation.

Defendants' picture offered contrasting details. Jones, Yazzie, Nolan Charlie, and Harrington Blueeyes, all present at the Seven-to-Eleven, testified to "going to meet this guy" who, they were told, packed a gun under the waistband in the back of his pants and a long knife in a boot. Nolan Charley[9] testified he had been drinking all day and was "pretty drunk" that night at the Zia Bar when he met Eagle who identified himself as a member of the Banditos. He added Eagle showed him a bag of peyote. Nolan Charley, a member of the Norbanos, thought it unusual for a non-Navajo to be at the Zia Bar asking for Navajo bikers. On cross-examination, Harrington Blueeyes testified when he was awakened by Nolan Charley, he was told "a guy wants to meet you," and interpreted "you" to mean a Norbano. At the Seven-to-Eleven parking lot, Mr. Blueeyes saw the blue car's headlights flash, approached Eagle to shake hands, and saw his hand digging in his pocket or his shoulder move before "everybody collided at once." Mr. Blueeyes stated he reached into the parked car to remove Begay's hand from the horn which was blaring and attempted to punch Begay but missed.

---

[9]The court granted the government's request to treat Nolan Charley as a hostile witness.

Alfred Yazzie, thirty-nine years old,[10] testified in his own defense. He described his night helping Jones prepare to leave for Safford, and accompanying him to the Zia Bar where he overheard little of Jones' conversation with Curtis Benally because he periodically left to check on the truck packed for the trip. However, he testified Curtis Benally told Jones "to watch out for himself, that guy got a piece in his back." Yazzie testified he thought the flashing headlights were a signal perhaps signifying a set-up and described Eagle's getting out of the car, "a big man, huge." Yazzie recounted as Eagle straightened, "he said something like to me sound like a threat, 'you motherfucker,' or something like that," looking directly at him. Yazzie described Eagle's moving aggressively and reaching with his left hand behind him. Believing Eagle was reaching for "the piece" Curtis Benally described, Yazzie testified he reacted by kicking defensively at the hand and then seeing someone come from behind Eagle, not knowing who it was. Although he did not remember taking out his pocketknife, Yazzie stated he planned to punch out the car's tires, but, in the confusion, stabbed Eagle three times after Eagle had been knocked to the ground. Yazzie testified he threw the knife into the San Juan River as they crossed the bridge. Although he and Jones had consumed two six-packs of beer and shots of tequila and vodka during the course of the night, he described himself as drunk, but "not drunk drunk."

---

[10]Mr. Yazzie, who is five feet six inches tall and weighs 180 pounds, is blind in his right eye and, on June 26, 1997, had a broken arm in a sling.

Raymond Jones also testified, describing his roots in the Shiprock area where he attended school with Alfred Yazzie. Jones described his service in the United States Marines before returning to Shiprock where, until his arrest, he worked at the Navajo Engineering Construction Authority (NECA). Jones explained his role as the president of the Norbanos, a Navajo motorcycle club named after an heroic Navajo leader revered for protecting his people. Jones testified when Brenda Charley telephoned him, he understood the call to be a warning. He told the jury Ms. Charley said Eagle was scary. He testified Curtis Benally then described Eagle as a big biker, tattooed all over, and carrying a piece. When he pulled his truck into the Seven-to-Eleven parking lot, he spotted Eagle's car backed up in a dark area at the far side. He testified that after parking to the side of Eagle's car, he reached back to get his flashlight but instead grabbed the handle of a baseball bat which he kept in the truck along with a pistol and axe. Jones explained he took the bat in case something happened. Jones stated when Eagle turned and looked at him, he spotted a bulge and pistol grip in the back of Eagle's pants. He told the jury he heard shouting, like "you motherfuckers," and saw Eagle lunge for Yazzie before he swung at Eagle's back to disable him. He described a rush of adrenaline and fear taking over as he found himself swinging, losing control, believing Briggs, down, was reaching for his right leg. Jones testified he feared hearing a gunshot, that one or all of them would be shot, and as the horn blared, he yelled "let's get out of here . . . what are we doing, what is happening here?"

The government cross-examined Jones about his calling his mother after he was arrested and telling her to remove the pistol he kept in his truck. Although he explained he wanted the gun put in a safe place, the prosecutor impeached the statement with evidence of a 1995 fourth-degree felony conviction for DUI, which, it asserted could premise a possible prosecution of Jones for felon in possession of a dangerous weapon. After objection, the court permitted the question, and Jones responded he believed the offense was a misdemeanor conviction. The government later discovered its error in labeling the prior conviction a felony and entered a stipulation that Jones lawfully possessed the gun.[11]

Key to the contrasting depictions was, as argued by the government, the jury's resolution of the state of mind of the victim as he sought out biker brothers to party. While the government's witness, Mary Overson, the Zia bartender, described Eagle as "very distinguished looking,"[12] defense witnesses cast him as huge and scary. To assist the jury's resolution, defense counsel attempted to introduce evidence of Briggs' 1984 state indictment for murder and tampering with evidence,[13] which predicated his most recent conviction of felon in possession of a firearm or dangerous weapon. The court

---

[11]The court instructed the jury to disregard the testimony.

[12]The witness stated, "He had tattoos from head to toe, all over his arms, his neck, kind of like – I don't know if they were kangaroos or bunny rabbits around his neck. He was very polite."

[13]Briggs pled guilty to voluntary manslaughter of his Native American wife and was sentenced to four years' imprisonment.

relied on ***Old Chief v. United States***, 519 U.S. 172 (1997), to limit all such testimony to the simple fact of the felony convictions in 1984 and 1995.

Persisting in the effort to focus on the victim's violent character to explain the fatal confrontation, defense counsel attempted to introduce evidence of Briggs' habit of carrying a knife and gun, and routinely fighting with people he confronted. To this end, defense counsel called Chuck Cowen, the bartender at the Myung Gong Club in Albuquerque, a bar Briggs frequented until about 1996. Cowen told the court, outside the presence of the jury, Briggs came in daily and regularly scared and threatened other patrons for drinks, money, or transportation.[14] Cowen described Briggs' removing his shirt to display his tattoos, adding "[h]e'd walk right in front of somebody and pull his lip down and put it right in their face." Asked why he did not call the police or throw Briggs out, Cowen explained he was afraid Briggs would kill him and when he did call the police once, it took six officers to put him in jail. After hearing Cowen's testimony, the court grappled with whether it was admissible as evidence of habit or was more properly deemed to establish character. Although Cowen testified Briggs had a fight everyday in the bar, the court ruled because Briggs did not beat up everybody in the bar, the testimony could not be offered as the more specific and probative evidence of habit. With that ruling, Cowen then told the jury Briggs was a violent man who always came into the bar

---

[14]Cowen stated, "He intimidated people, he stole from people, he brought – tried to sell stolen merchandise to people, he made people do things against their will."

with a foot-long knife hanging from his belt or in his boot despite the prohibition against weapons in the bar.  Similarly, defense witness Teresa Johnson with whom Briggs lived for a year, was permitted only to tell the jury Briggs was a violent man who always carried a gun.

In rebuttal, the government called Clara Briggs, Eagle's mother, who described a conversation she had with her son a month before his death.  Mrs. Briggs stated he sounded good during the call, evidencing, the government later argued, his positive state of mind.  She was permitted to show a photograph of herself and Briggs and told the jury her son was right-handed.

Despite the divergence in these portrayals, the stranger in town to party versus a violent biker packing a piece -- the court refused to instruct the jury on the lesser included offense of involuntary manslaughter.  Rather, it instructed the jury to assess the evidence under the rubrics of second-degree murder and voluntary manslaughter.  Jones now urges this error was produced by the court's improperly excluding relevant evidence of character and habit.  In his separate appeal, Yazzie contends the court's denial of pretrial motions for separate trials prejudiced him.  Although the court properly denied the motions to sever, its failure to permit the jury to consider the evidence under the lesser included offense instruction on involuntary manslaughter was error.  Because this error affects both appeals, we address it first.

## II.  Involuntary Manslaughter Instruction

Jones[15] contends his trial was the "textbook case" in which both second-degree murder and involuntary manslaughter instructions are warranted by the evidence. He cites his testimony he went to meet Briggs in fear for himself and others and with the convergence of fear and the adrenaline it produced "went a little crazy," as he had told F.B.I. Agent Chimits. Thus, the jury could reasonably have found he acted in self-defense in a criminally negligent manner. Jones asserts the court's instruction on voluntary manslaughter did not cure the error, the elements of the two offenses being different. Thus, by refusing to instruct the jury on involuntary manslaughter, Jones contends the court undermined his theory of self-defense and usurped the jury's fact-finding responsibility, requiring reversal of his conviction and a new trial. Jones relies on *United States v. Benally*, 146 F.3d 1232 (10th Cir. 1998).

*Benally* reversed a conviction for voluntary manslaughter on the ground defendant presented evidence warranting instructions to the jury on self-defense and involuntary manslaughter. There, a fisticuffs erupted among partiers who were drinking and became irate when one of their group returned without the marijuana he had promised. The punching and kicking escalated; and the victim's body was found the next morning. Charged with first-degree murder and aiding and abetting, defendant requested the two instructions based on evidence the victim had thrown the first punch knocking off his

---

[15]Mr. Yazzie joined in Mr. Jones' brief to the extent the issues raised apply to his appeal.

- 13 -

glasses as he attempted to defend himself. Acknowledging the trial court's discretion to determine whether there is evidence to justify a lesser included offense instruction, the reviewing court concluded defendant satisfied the four criteria entitling him to the instruction on the lesser included offense of involuntary manslaughter. Those criteria are (1) a proper request; (2) the lesser included offense contains some but not all of the elements of the offense charged; (3) the elements differentiating the two offenses are in dispute; and (4) a jury could rationally convict defendant of the lesser offense and acquit on the greater offense. *Id.* at 1236 (citation omitted). Consequently, we held the court erred in refusing to instruct on defendant's theory of involuntary manslaughter when there was evidence presented at trial that defendant's actions constituted the criminally negligent exercise of nondeadly force. *Id.* at 1237.

"[A] defendant is always entitled to an instruction giving his theory of defense if supported by the evidence." *United States v. Moore*, 108 F.3d 270, 273 (10th Cir. 1997). While the trial court's decision whether to instruct on defendant's request for a lesser included offense resides within its sound discretion, we review de novo whether defendant "has made a threshold showing as to each element" of the lesser included offense. *United States v. Williams*, 791 F.2d 1383, 1388 (9th Cir. 1986). "In conducting this review we must give full credence to defendant's testimony." *Id.* Moreover, "[i]n determining whether to instruct on [a] lesser offense, the court must take into account the possibility that the jury might . . . make findings different from the version set forth in

- 14 -

anyone's testimony." ***United States v. Begay***, 833 F.2d 900, 902 (10th Cir. 1987), quoting 2 Charles Alan Wright, Federal Practice and Procedure § 498, at 799 (2d ed. 1982). Thus, "[o]nly when an appellate court is convinced that the evidence issues are such that a rational jury could *acquit* on the charged crime but *convict* on the lesser crime may the denial of a lesser included offense charge be reversed." ***Id.*** at 272.

The question before us then becomes whether there was evidence upon which the instruction of involuntary manslaughter could be predicated. That is, do the facts warrant giving the instruction?

Jones contends the ambiguity of the flashing headlights, the threat or curse Briggs uttered, the movement of his hand or shoulder, and the information Briggs had a gun on him satisfy the evidentiary threshold of the four-part test.[16] These facts taken together, he asserts, give rise to the inference defendants acted in defense of themselves and others "in the commission in an unlawful manner . . . of a lawful act which might produce death." 18 U.S.C. § 1112(a) (1994).

Although the government counters with the physical evidence of the brutality of the attack, the apparent innocence of Briggs' search for a "party," and testimony about not seeing a weapon or being told about a gun,[17] those facts do not automatically trump

---

[16]It is unrefuted Jones met the other three criteria for giving a lesser included offense instruction.

[17]Through F.B.I. Agent Chimits' testimony, the government sought to impeach statements about defendants being told about a gun or seeing the gun's bulge. Chimits
(continued...)

- 15 -

defendants' evidence. Instead, they remain for a jury, properly instructed, to resolve.

Further, we disagree with the government's assertion the court's instructing the jury on voluntary manslaughter sufficiently filled the gap between finding defendants acted without malice or in self-defense. That view overlooks defendants' fully advanced theory of self-defense.[18] "If the defendant attempts to use nondeadly force, but does so in a

[17](...continued)
stated when he initially interviewed each of the participants in these events, no one mentioned the presence of a gun or weapon. Confronted with the omission, witnesses tended to answer that Agent Chimits had not asked about weapons or the witness forgot to mention being told about a gun. The interviews were not recorded.

[18]The court instructed the jury on second-degree murder, stating, in part:

> First, that the defendants, Raymond Jones and Alfred Yazzie, unlawfully killed Thomas Briggs;
>
> second, that the defendants . . . killed Thomas Briggs with malice aforethought . . . .

It defined to kill with "malice aforethought" to mean "either to kill another person deliberately and intentionally or to act with callous and wanton disregard for human life. To find malice aforethought, you need not be convinced that the defendants hated the person killed or felt ill will toward the victim at the time."

The court then instructed, if the jury is unable to find second degree murder, to consider whether defendants are guilty of voluntary manslaughter, stating, in part:

> First, that the defendants killed Thomas Briggs without lawful justification;
>
> Second, that the defendants acted in the heat of passion;
>
> Third, the heat of passion was caused by adequate provocation . . . .

(continued...)

criminally negligent manner and death results, then both involuntary manslaughter and self-defense instructions would be warranted, particularly if there is any disputed fact issue concerning the quantum of danger reasonably perceived by the defendant." *Begay*, 833 F.2d at 901. In this case, the court instructed the jury on self-defense as a complete defense to second-degree murder or voluntary manslaughter. The jury was precluded from making findings "different from the version set forth in anyone's testimony." *Id.* at 902.

Thus, our review of the evidentiary record, including the flashing headlights, possible threat, and Briggs' body language, compels us to conclude the jury *could have* found Jones caused Briggs' death while defending himself and others, a lawful act, in an unlawful manner, using excessive force to disarm him. Similarly, it *could have* found Yazzie contributed to Briggs' death by committing a lawful act in an unlawful manner by considering his testimony that Eagle cursed him while lunging forward and reaching behind his back, causing Yazzie to react by kicking Eagle and stabbing him several times with a pocket knife. Further, the record swells with evidence of virtually all of the participants' drinking throughout the day and night of June 26th and possible

---

[18](...continued)
Had the court instructed on involuntary manslaughter, it would have included the elements of an unlawful killing of a human being without malice, in the commission of an unlawful act not amounting to a felony; or in the commission in an unlawful manner or without due caution or circumspection of a lawful act which might produce death.

Unlike *Benally,* where the court did not instruct on self-defense, here, the court did as related to heat of passion and voluntary manslaughter.

miscommunications when participants spoke in English or Navajo, and Navajo speakers applied their cultural norms to interpret statements or circumstances.[19] Consequently, we hold the district court erred in taking these issues from the jury by refusing to give defendants' instruction on involuntary manslaughter. Although there is evidence in the record to support the convictions, we must vacate them. We therefore reverse the convictions and remand for a new trial.[20]

### III. Evidentiary Issues

### A. Character Evidence

---

[19]For example, during the cross-examination of Mr. Yazzie, the prosecutor attempted to show he had changed his story about his reaction to Briggs, telling him he now had "new words" for "bad and cocky," which, the prosecutor stressed, are "now aggressive and threatening. Those are the words you want to use now to describe Mr. Eagle." Mr. Yazzie responded, "To me, kind of, you know, sounds the same thing, being English, don't know exactly the word and all. You can understand you grew up not speaking English and all you don't know the right words to put in there." Mr. Yazzie explained because he was spoken to in English, albeit the tribal investigator Mr. Ahkeah speaks Navajo, he responded in English out of respect for another individual in the room who did not speak Navajo.

[20]This disposition obviates the need to address Mr. Jones' contention the district court erred in failing to clearly distinguish the "callous and reckless disregard" component of the definition of malice aforethought given for second-degree murder from some extreme degree of negligence. The instruction the district court read comports with that delivered in *United States v. Joe*, 8 F.3d 1488, 1500 (10th Cir.1993). When it instructs on involuntary manslaughter on retrial, the court will necessarily have to distinguish that extreme mental state evincing a wanton or reckless disregard for human life from which a jury could infer malice aforethought from a less extreme state of mind required for the lesser included offenses. However, to the extent Mr. Jones' contention is, in fact, a dispute over the precise language used, the trial court's discretion in that choice is "a matter of settled law." *See United States v. Bryant*, 892 F.2d 1466, 1479 (10th Cir. 1989).

At trial, the strength and credibility of Mr. Jones' and Mr. Yazzie's claim of self-defense rested on portraying Eagle as a violent man, one habitually instigating fights and carrying a knife or a gun. The effort to introduce such evidence implicated Fed. R. Evid. 404(a)(1) and (a)(2), 404(b), 405(a) and (b), 406, and 608. Their boundaries and interplay figured in a pretrial motion, several bench conferences during the trial, and defendants' motion for a new trial. Jones now targets the court's limitation of the testimony of two of their witnesses on the ground its interpretation unduly constricted Fed. R. Evid. 406[21] and impeded their defense. They rely on **Perrin v. Anderson**, 784 F.2d 1040 (10th Cir. 1986). We address this and subsequent issues because they may likely arise on retrial.

The two witnesses, as previously recounted, were Chuck Cowen, the manager of an Albuquerque bar, and Teresa Meyers-Johnson, the owner of a tribal smoke shop who had lived with Briggs for a year. Prior to their testifying, defense counsel made an offer of the evidence they would provide: their opinion of Briggs as a violent person, his reputation as a violent person, and his habits of regularly carrying a gun and knife and routinely starting fights. Over the government's objecting to "this nonsense about habit,"

---

[21]Fed. R. Evid. 406 states:

> Evidence of the habit of a person or of the routine practice of an organization, whether corroborated or not and regardless of the presence of eyewitnesses, is relevant to prove that the conduct of the person or organization on a particular occasion was in conformity with the habit or routine practice.

the court agreed to hear their testimony initially without the jury present to decide whether there was sufficient foundation to permit the testimony to establish Briggs' habits to prove his violent character.

First, Mr. Cowen related he knew Briggs for five years, until about six months before his death, observing him daily in his bar. Mr. Cowen stated "routinely, daily," Briggs intimidated, scared, and threatened people in the bar.

> He would always get in a fight, he would fight people that he could bully. He would push them around. If people stood up to him, he would hit them. He would just -- beat them until he got what he wanted out of them. Either they were subdued or they were submissive to him.

Mr. Cowen described Briggs' introducing himself to new patrons by removing his shirt to display his tattoos and pulling down his lower lip to reveal the obscene tattoo. Mr. Cowen stated he repeatedly caught Briggs in the bathroom intravenously injecting drugs but feared reporting him to the police because Briggs threatened to kill him if he did. Further, he testified Mr. Briggs routinely carried a large knife although weapons were prohibited in the bar.

The government objected the testimony was too remote in time, especially given the more recent statement of the Zia bartender that Briggs was charming and polite. It relied broadly on the proviso in the advisory committee's note to Rule 406 about using "intemperate 'habits'" as proof of drunkenness in accident cases "to show habit or assault." The court then questioned the witness, clarifying the statement Briggs had a fight everyday, expressing its concern over whether the evidence, in fact, more properly

reflected specific acts proving character. Pursuing that distinction, the court asked,

> The Court: Mr. Cowen, did he beat up everybody in the bar?
> The Witness: No, he didn't.
> The Court: What happened to the other people . . . .
> The Witness: Some people he – he picked on the weak people.
> The Court: Okay. So he would come into the bar and then he would
> eventually . . . get into a fight because he would seek out the weak people?
> The Witness: Yes, he would look for somebody that he could threaten first. If
> they didn't agree with him, then he'd fight them.
> The Court: I think that's character evidence. *If he beat up everybody he met,*
> *that would be habit.* So he didn't – his character – and he can testify as
> to the violent character of Mr. Briggs.

The court also ruled the evidence of Briggs' use of drugs and selling stolen goods constituted character evidence and agreed with the government's request to prohibit Mr. Cowen from testifying about any specific acts. Consequently, Mr. Cowen simply told the jury Briggs had a reputation of being a bully and "a very violent man," and wore a foot-long knife in his belt or in his boot.

The government similarly objected to the second witness, Ms. Myers-Johnson,[22] proffered for the same purposes. It asserted such habit evidence is inadmissible "with respect to [Jones'] self-defense claim. He can only bring in reputation for violence, that's it." Reluctantly, the court followed the same procedure, excusing the jury for counsel to voir dire the witness.

Ms. Myers-Johnson then told the court she lived with Briggs from 1992 until 1993

---

[22]Counsel described the witness as "some woman who's going to claim that Mr. Briggs held her hostage. It's the same sort of stuff."

in a "hostage relationship." She testified,

> I feared for my life if I got away from him. I was faced with constant threats that if I tried to leave him I would be murdered like the woman he had murdered before.

Ms. Myers-Johnson stated Briggs told her he owned the same 1947 Harley-Davidson as she had, "an excuse to get to know me." After turning a sympathetic ear to his marital problems, she soon discovered he had moved in and "that's when he told me that he had murdered the last woman that did not want to be involved [with] him." The court interrupted and ruled the evidence about a hostage relationship would be excluded and urged counsel to proceed to her knowledge of Briggs' routine practices. She, too, testified Briggs regularly picked fights, manipulated and intimidated people and carried a gun, either a small gun behind his jacket or a larger one under his arm. Ms. Myers-Johnson stated Briggs threatened her daily, knowing she did not want to remain in the relationship. She stated Briggs went to bars every day, told people he confronted he was a member of the Banditos, although he was not, and often stole the motorcycle of individuals he met and overcame. She also described Briggs' pulling down his lower lip in salutation.

However, the court ruled the testimony about this behavior, even if revealing habit, was irrelevant to Briggs' propensity for violence,[23] necessarily rejecting defense counsel's

---

[23]The court observed, "You haven't told me how it is relevant to this case. If the man had a habit of brushing his teeth every morning, it's not relevant to this case."

explanation the conduct was a manifestation "intertwined with the violence that's intrinsic to our defense." However, it nonetheless concluded Briggs' putting a gun in his belt each morning qualified as evidence of habit. Ms. Myers-Johnson then told the jury Briggs was a "very violent man," known by others for his aggressiveness. She also testified Briggs always carried a gun and was left-handed.

Persisting in their characterization of the excluded evidence, Jones maintains the district court abused its discretion in unduly limiting his presentation of a defense. The essence of his claim, portraying the victim as aggressor, predicated defendants' theory of self-defense. Thus, Jones insists, the evidence of habit was essential to establish Briggs routinely was the aggressor in encounters he provoked.

We frame our analysis with Fed. R. Evid. 401, which states:

"Relevant evidence" means evidence having any tendency to make the existence of *any fact* that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

(emphasis added). The standard is not stringent; it is aimed at each "brick" of evidence potentially making a wall and not every witness "mak[ing] a home run." Fed. R. Evid. 401 advisory committee's note, quoting McCormick, § 152; and Falknor, *Extrinsic Policies Affecting Admissibility*, 10 Rutgers L. Rev. 574, 576 (1956). Consequently, we begin by asking whether evidence of the victim's prior conduct in instigating fights has "any tendency" to make more probable the fact that he was the aggressor here. *Id.* Of course, that evidence must survive the crucible of Fed. R. Evid. 403, which excludes

otherwise relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or delay, waste of time, or needless presentation of cumulative evidence."

Nevertheless, because character evidence is highly susceptible to these enumerated shortcomings, it is categorically excluded under Fed. R. Evid. 404 *except* in three instances. One such exception, subsection (a)(2), figures here.[24] While 404(a)(2) permits evidence of the victim's character, Fed. R. Evid. 405[25] limits the permissible

---

[24]Rule 404(a)(2) states:

> (a) **Character evidence generally.** Evidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion, except:
> . . . .
> (2) **Character of victim.** Evidence of a pertinent trait of character of the victim of the crime offered by an accused, or by the prosecution to rebut the same, or evidence of a character trait of peacefulness of the victim offered by the prosecution in a homicide case to rebut evidence that the victim was the first aggressor.

[25]Fed. R. Evid. 405 states:

> **(a) Reputation or opinion.** In all cases in which evidence of character or a trait of character of a person is admissible, proof may be made by testimony as to reputation or by testimony in the form of an opinion. On cross-examination, inquiry is allowable into relevant specific instances of conduct.
>
> **(b) Specific instances of conduct.** In cases in which

(continued...)

methods of proof.

There is ample precedent defining the circumstances and bounds for admitting evidence of a victim's violent character to prove a claim of self-defense. *See, e.g., United States v. Talamante*, 981 F.2d 1153 (10th Cir. 1992) (specific instances of conduct not admissible to prove victim was first aggressor when character is used circumstantially); *United States v. James*, 169 F.3d 1210 (9th Cir. 1999) (en banc) (corroborating evidence of victim's violence is admissible to establish defendant's credibility in self-defense claim); *United States v. Keiser*, 57 F.3d 847 (9th Cir. 1995) (victim's propensity for violence may only be offered by opinion or reputation testimony); *United States v. Greschner*, 647 F.2d 740 (7th Cir. 1981) (evidence of victim's prior violent act is relevant to prove self-defense); *United States v. Burks,* 470 F.2d 432 (D.C. Cir.1972) (where self-defense raised and issue over who is aggressor, evidence of deceased's violent character is admissible and relevant though unknown to defendant). In each case, Fed. R. Evid. 405 limited the reach of Fed. R. Evid. 404(a)(2).

However, these limitations do not burden proof of habit. *Perrin v. Anderson*, 784 F.2d at 1040. Habit, one's "regular practice of meeting a particular kind of situation with a specific type of conduct," Fed. R. Evid. 406 advisory committee's note, is admissible to show a person acted "in conformity with the habit or routine practice." In full, the rule

---

[25](...continued)
> character or a trait of character of a person is an essential element of a charge, claim, or defense, proof may also be made of specific instances of that person's conduct.

provides:

> Evidence of the habit of a person or of the routine practice of an organization, whether corroborated or not and regardless of the presence of eyewitnesses, is relevant to prove that the conduct of the person or organization on a particular occasion was in conformity with the habit or routine practice.

Fed. R. Evid. 406. Habit evidence may offer a backdoor to proving character for, although evidence an individual routinely acted in a particular manner may be offered to show he *acted* in conformity on an occasion, those routine practices may also coalesce to provide specific instances proving character. A habit of routinely accosting others may, thus, provide potent evidence the individual similarly acted in conformity and may have been the aggressor in a particular instance. Indeed, "[c]haracter may be thought of as the sum of one's habits," Fed. R. Evid. 406 advisory committee's note. Thus, this potential of establishing the forbidden ultimate fact, proof of action in conformity with one's *character*, makes its admission highly discretionary and potentially troublesome.

Certainly, the district court was well versed in these distinctions and exercised its discretion to admit defendants' evidence of Briggs' reflexive action of placing a gun in his waistband or knife in his boot, recognizing the uniformity of this response established its habitual nature. However, to the third proffer, that Briggs routinely started fights, picking on weak people he met in bars and beating them up, the court balked, excluding that evidence because it did not represent a sufficiently semi-automatic reaction, it was, instead, evidence of character. Although Jones may be correct in stating that Rule 406

does not require an individual "to act in a given way every minute" in every situation,[26] "[t]he extent to which instances must be multiplied and consistency of behavior maintained in order to rise to the status of habit inevitably gives rise to differences of opinion." Fed. R. Evid. 406, advisory committee's note. Resolving those differences resides within the trial court's sound exercise of discretion. Under the circumstances here, we cannot say exclusion of the evidence was an abuse of that discretion.

### B. Impeachment

Mr. Jones sought to introduce evidence of Briggs' 1984 conviction of manslaughter and 1995 conviction of felon in possession of a dangerous weapon to impeach the victim's hearsay statement he was in town to meet bikers and "party." Considering Fed. R. Evid. 609(1) through the lens of Fed. R. Evid. 403 as well as the Supreme Court's holding in **Old Chief**, 529 U.S. at 172, the trial court concluded defendants could not introduce the name of the felonies for which Briggs was convicted to avoid "the risk of confusion of the jury and perhaps misleading of the jury into thinking that this establishes his character for doing such acts at the time of the event in question." The prosecutor then told the jury Briggs was convicted of a felony in 1984 and another in 1995.

---

[26]In fact, the advisory committee's note to Rule 406 offers examples of habits but recognizes "precise standards" do not delineate when a particular behavior matures into a habit although two factors predominate: adequacy of sampling and uniformity of response. Fed. R. Evid. 406, advisory committee's note.

Jones now asks us to level the playing field: if the prosecution is permitted to tell the jury about defendant's "facts of convictions, the nature of the crimes, and the punishment" (quoting *United States v. Wolf*, 561 F.2d 1376, 1381 (10th Cir. 1977)), despite real prejudice to the defendant, why not allow the jury to hear the same information about a deceased victim where there is no possibility of prejudice. Jones contends Fed. R. Evid. 609 would permit such evidence and *Old Chief* is inapplicable. The government responds the court correctly discerned "the ineluctable effect" on the jury of evidence the victim was convicted of manslaughter and carrying a firearm given the dispute over the victim's state of mind when the fray occurred. It characterizes the evidence as that of specific bad acts under Fed. R. Evid. 404(b) offered without proper foundation and argues, in any case, defense counsel failed to object to the alleged hearsay statements.

We review the trial court's exclusion of evidence of the details and nature of the deceased victim's prior convictions to decide if it constitutes an abuse of discretion warranting a new trial. *United States v. Linn*, 31 F.3d 987, 991 (10th Cir. 1994). In this instance, we cannot say the court abused it discretion.

First, Fed. R. Evid. 609, supplementing Fed. R. Evid. 608, targets a *witness*, "one who testifies to what he has seen, heard, or otherwise observed." *Black's Law Dictionary* 1438 (5th ed. 1979). Briggs was not a witness, and although his statement was introduced through the testimony of various government witnesses, defense counsel did not object on

hearsay grounds and only later made this argument. Consequently, when the trial court carefully weighed admission of the names of the convictions by balancing Rule 609, Rule 404(b), and Rule 403, and looking to the extensive discussion in *Old Chief* of "the analytical method to be used in Rule 403 balancing," 519 U.S. at 182, it may have spread too wide a net. There was no testimony of Mr. Briggs subject to impeachment. Nonetheless, the court correctly recognized the ultimate nature of the evidence was to prove the victim's character and action in conformity with that character and properly, then, snagged it with Rule 403's hook.

Although *Old Chief* focuses on the specific problem of how to prove a prior conviction under 18 U.S.C. § 922(g)(1), the "principal issue" addressed was "the scope of a trial judge's discretion under Rule 403." *Id.* at 179. The Court concluded, "[t]hus the notes [to Rules 403 and 404(b)] leave no question that when evidence 'may' be excluded, the discretionary judgment may be informed not only by assessing an evidentiary item's twin tendencies, but by placing the result of that assessment alongside similar assessments of evidentiary alternatives." *Id.* at 184 (citations omitted).

The district court did not abuse its discretion in deciding the close similarity of the past convictions to the present circumstances might confuse the jury, permitting it to decide the case on improper grounds. Although the tidier resolution might have been to exclude the evidence on grounds of relevance, forestalling the intriguing question of who, under these circumstances, suffers prejudice under the Rule 403 balancing, the court's

ruling was correct.  Ultimately, the convictions provided potent character evidence highly

susceptible of misleading the jury.

### C.  Clara Briggs' Testimony

Mr. Jones further contends the court abused its discretion in prohibiting him from

questioning Mrs. Clara Briggs on specific instances of her son's conduct after the

government elicited rebuttal testimony to the defense portrait of his aggressiveness.

Again, we review the relevance and possible prejudice of the court's evidentiary ruling

for an abuse of discretion.  *United States v. McVeigh*, 153 F.3d 1166, 1188 (10th

Cir.1998), *cert. denied*, 119 S. Ct. 1148 (1999).

After objection to the government's proffer that Mrs. Briggs would read a letter

her son wrote a year before his death and show a photograph of herself standing with him,

the trial court concluded while the former was impermissible character evidence, the

latter was not and the government could take the risk of inquiring about Briggs' state of

mind.  Mrs. Briggs then testified, showing the 1997 photograph, commenting her son had

gained weight.  The government then asked Mrs. Briggs when she last talked to her son

and what "if any, plans did Mr. Briggs have during the time that you talked to him?"  She

answered because she had been sick, Briggs was planning to visit her that summer in

Rochester, New York.  When the government asked her to describe her son's state of

mind during the conversation, Mrs. Briggs responded, "He sounded good.  He sounded

like he was doing real good in life, and I was very proud of him.  He just sounded really

very positive about life." Mrs. Briggs also stated her son was right-handed. Defense counsel then cross-examined the witness, showing her another picture of Briggs next to a motorcycle and asking her about the discrepancies in his birth date.

Mr. Jones, quoting 1 Christopher B. Mueller and Laird C. Kirkpatrick, Federal Evidence § 102, at 565 (2d ed. 1994), contends this rebuttal testimony went beyond the facts of the case painting "not only a picture of innocence but a self-portrait of a person whose background, outlook, personality, or philosophy make it unlikely that he committed the crime . . . which does open the door to counterattack by the prosecutor." He urges the resulting prejudice he suffered by leaving the jury with this homely picture without the opportunity to cross-examine about specific acts of bad character requires reversal.[27]

Although it is difficult to imagine any other purpose for calling a victim's mother to testify about her knowledge of her son's "state of mind" than to backdoor some expression of his character, the court did not abuse its discretion in permitting the testimony, recognizing the slim border to character evidence, and in confining any cross-examination to that narrow swath. Just as Fed. R. Evid. 404(a)(2) permits defendant to present evidence of the character of the victim, it explicitly provides for the prosecution

---

[27]During oral argument, the government refuted this contention by relying on a case not cited previously to the court. Although, on this occasion and two others, it stated it would submit 28(j) letters supplementing its brief, the court has not received any additional authority. 10th Cir. R. 28(j).

"to rebut the same." *See United States v. Whalen*, 940 F.2d 1027, 1030 (7th Cir. 1991). The record reveals the careful parries made into that area by both sides in recognition of the land mines triggered by opening the door to character evidence. Given defendants' effort to cast Briggs as the aggressor, the court properly exercised its discretion in permitting and limiting the rebuttal testimony.

### IV.  Jones' Motion to Suppress

Mr. Jones moved to suppress his post-arrest statements claiming he did not effectively waive his right to counsel and once he asked for counsel, the custodial interrogation should have stopped.  After a hearing, the district court concluded the totality of the circumstances indicated Jones spoke voluntarily to F.B.I. Agent Chimits and fully understood his rights as read to him in a setting free of any express or implied coercion. We view the evidence produced at the pretrial suppression hearing in the light most favorable to the government and accept the district court's factual findings unless they are clearly erroneous.  *United States v. Blaze*, 143 F.3d 585, 590 (10th Cir. 1998).  However, review of the court's legal conclusion of voluntariness is de novo.  *Id.*

At the suppression hearing, Agent Chimits described his questioning Jones after he and three other investigators traveled to the Navajo Nation construction site where Jones worked, arrested him on a tribal warrant for aggravated assault, and handcuffed him. After transporting him to tribal investigator Sammy Ahkeah's office, Agent Chimits testified he read in its entirety a form explaining a defendant's legal rights and handed the

paper to Mr. Jones who was asked to read a couple of lines aloud. Assured that Jones read English and had read the entire form, Agent Chimits testified Jones then told him he was willing to speak to them but would not sign the form despite the assurance that signing the form only indicated "he understood his rights and was willing to waive them at that time by signing the form." Although Agent Chimits wrote, "refused to sign" on the form, he testified Jones clearly indicated his willingness to tell his side of the story and subsequently implicated himself in the incident. On cross-examination, he testified Jones asked, "Do I need a lawyer?" Agent Chimits answered he reviewed the form making sure Jones understood his rights. Agent Chimits stated he did not tell Jones a lawyer was not available in Shiprock or his girlfriend, Ms. Tanner, would be arrested if Jones did not cooperate. He stated had Jones asked for an attorney, the interview would have ceased immediately. In his testimony, Tribal Investigator Sammy Ahkeah stated Jones asked, "like, 'What did I do that I need a lawyer?' . . . Then we told him that it's up to him."

Mr. Jones testified after he was read his rights, Agent Chimits threatened to arrest his girlfriend and told him, "Okay, you want to play hard ball, we'll play hard ball." Jones stated he asked, "Can I get a lawyer?" and was told one was not available.

Assessing whether the government showed by a preponderance of the evidence Jones knowingly and voluntarily waived his Miranda rights, the court concluded defendant "was capable of and did understand" his right to an attorney and to refuse to answer questions. The court deemed the contradicting testimony about a threat to Ms. Tanner,

under all of the circumstances, made no sense, and "did not amount, even if it happened, to a threat, and I conclude that it didn't happen." On the basis of these factual findings, the court concluded defendant's statement was voluntary.

Substantial evidence in the record supports the conclusion Jones made a knowing and voluntary waiver of his Miranda rights. His refusal to sign the advice of rights form was clearly overridden by Mr. Jones' verbal indication he understood his rights and was willing to talk. *See **United States v. Austin***, 933 F.2d 833, 835 (10th Cir. 1991). As a matter of law, we agree defendant's statement was voluntary. ***Id.***

### V. Separate Trial Motion

Mr. Yazzie contends the court's refusal to grant his motion to sever his trial from Jones' resulted in fundamental prejudice because of the qualitative and quantitative differences in the evidence against each defendant. Uncontroverted evidence reflected his co-defendant inflicted the fatal blows captured in highly gruesome photos of the bludgeoned skull and body introduced against both defendants. In contrast, Yazzie maintains the only evidence the government produced of his involvement simply placed him with Jones preparing to drive to Arizona and remaining in the truck while Jones spoke to others about Briggs. The joint trial thus permitted the government to overlay his specific acts of kicking and superficially stabbing Briggs with the overwhelming graphic evidence against his co-defendant and precluded him from contradicting Jones' trial claims because of the sweep of the aiding and abetting charge.

- 34 -

The trial court denied the motion, expressing its belief nothing in either defendant's statements was exculpatory or prejudicial to the other defendant; the indictment was properly framed joining both defendants; and there was no risk of conflicting defenses. The court relied on *Zafiro v. United States*, 506 U.S. 534 (1993) (evidence against some co-defendants can create the risk of an unfair trial for the other co-defendants); *Richardson v. Marsh*, 481 U.S. 200 (1987), and *United States v. McConnell*, 749 F.2d 1441 (10th Cir. 1984). We review that decision for an abuse of discretion. *United States v. Martinez*, 76 F.3d 1145, 1152 (10th Cir. 1996).

"[W]hen defendants properly have been joined under Rule 8(b), a district court should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro*, 506 U.S. at 539. Even mutually antagonistic defenses are not prejudicial *per se*. *Id.* at 538.

Given the government's aiding and abetting charge, Mr. Yazzie has not articulated any evidence, claim, or theory of defense that could not also be introduced were he to have been tried separately. Thus, having failed to articulate any specific trial right that was compromised by the joint trial, we cannot say the trial court abused its discretion under Fed. R. Crim. P. 14. *Martinez*, 76 F.3d at 1152-53.

## VI. Aiding and Abetting

Mr. Yazzie contends the court failed to instruct the jury he must share in Jones'

intent or knowledge in the commission of second-degree murder. Although he asserts as "indisputable" that he "deliberately associated himself in some way with the crime by being present at the crime scene, approaching Briggs, and kicking at Briggs in response to Briggs," and that he "participated in the assault upon Briggs," he insists the instruction is erroneous because it failed to guide the jury to find he intended to assist in the *killing*, the second-degree murder. He contends the jury must be instructed he intended each element of the crime alleged. Because second-degree murder is a specific intent crime requiring proof of malice aforethought, the instruction had to guide the jury to find he acted with malice aforethought. Because we presume that on retrial the government will advance the same theory of Mr. Yazzie's culpability, we address that instruction here.

The court instructed the jury:

> The guilt of the defendant in a criminal case may be established without proof that the defendant personally did every act constituting the offense alleged. The law requires that, ordinarily, anything a person can do for himself may also be accomplished by that person through the direction of another person as his or her agent, or by acting in concert with, or under the direction of, another person or persons in a joint effort or enterprise.

> So, if another person is acting under the direction of the defendant or if the defendant joins another person and performs acts with the intent to commit a crime, the law holds the defendant responsible for the acts and conduct of such person just as though the defendant had committed the acts or engaged in such conduct.

> Notice, however, that before any defendant may be criminally responsible for the acts of others, it is necessary that the accused deliberately associate himself in some way with the crime and participate in it with the intent to bring about the crime.

Of course, mere presence at the scene of a crime and knowledge that a crime is being committed are not sufficient to establish that defendant either directed or aided and abetted the crime unless you find beyond a reasonable doubt that the defendant was a participant and not merely a knowing spectator. In other words, you may not find any defendant guilty unless you find beyond a reasonable doubt that every element of the offense as defined in these instructions was committed by some person or persons, and that the defendant voluntarily participated in his commission with the intent to violate the law.

The instruction properly informed the jury how to assess the evidence of Mr. Yazzie's kicking Briggs, using his pocket knife to wound Briggs, and leaving with Jones -- each a deliberate and intentional act. Despite Mr. Yazzie's reliance on Eighth Circuit law, the instruction properly tracks our precedent, *see **United States v. Smith***, 133 F.3d 737, 742 (10th Cir. 1997), *cert. denied*, 118 S. Ct. 2306 (1998), and is not erroneous.

## VII. Conclusion

Because of the trial court's failure to instruct the jury on involuntary manslaughter, we, therefore, **VACATE** Mr. Jones' conviction and **REMAND** the case for a new trial guided by our disposition of the remaining issues. This disposition requires **VACATION** and **REMAND** of Mr. Yazzie's conviction and moots any sentencing issues raised in these appeals.